IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 1, 2025

IN RE KRYSTOPHER C. ET AL.

Appeal from the Juvenile Court for Cannon County
No. 23-JV-10          Ryan J. Moore, Judge[1]

No. M2024-00097-COA-R3-PT

In this case involving termination of the father's and mother's parental rights to their two minor children, the trial court determined that three statutory grounds for termination had been proven as to each parent by clear and convincing evidence. The trial court further determined that clear and convincing evidence demonstrated that termination of the father's and mother's parental rights was in the children's best interest. The father and mother have each appealed and have proceeded *pro se* upon waiving their rights to appointed counsel. Having determined that clear and convincing evidence did not support the trial court's finding of the statutory abandonment ground of failure to support as to the mother, we reverse the trial court's judgment with respect to this ground as to the mother. We affirm the trial court's judgment in all other respects, including termination of the father's and mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JEFFREY USMAN and VALERIE L. SMITH, JJ., joined.

Roy C., Crossville, Tennessee, Pro Se.

Krystle J., Crossville, Tennessee, Pro Se.

Jonathan Skrmetti, Attorney General and Reporter, and Jason R. Trautwein, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

---

[1] Sitting by interchange.

**OPINION**

**I. Factual and Procedural Background**

This case focuses on Krystopher C. and Timothy C., the minor children ("the Children") of Roy C. ("Father") and Krystle J. ("Mother") (collectively, "the Parents"). In October 2019, the Tennessee Department of Children's Services ("DCS") responded to a referral alleging nutritional neglect and lack of supervision of Timothy, who was an infant. On October 23, 2019, DCS filed a petition in the Cannon County Juvenile Court ("trial court"), alleging that the Children were dependent and neglected as to both parents due to malnourishment of Timothy, domestic violence in the home, and illicit drug use by Father. In the dependency and neglect petition, DCS requested entry of an immediate protective custody order and asked that visitation between the Children and parents be supervised.

In its final order terminating parental rights, the trial court found that trial testimony had established the following facts surrounding the Children's removal into protective custody:

CPS [Children's Protective Services] investigator Alicia Cantrell received a referral in October of 2019 regarding Timothy and Krystopher [C]. Timothy [C.] was seven months old at the time and Krystopher [C.] was eleven years old. Ms. Cantrell met [Mother] at her home on October 17, 2019. Ms. Cantrell discussed the allegations of the referral that Timothy was malnourished. [Mother] explained that her WIC [Women, Infants, and Children] benefits had been reduced from ten cans of baby formula to seven cans. [Mother] said that when the formula ran out, she and [Father] fed Timothy water and 2% milk. Ms. Cantrell asked [Mother] about baby food and [Mother] confirmed that they received 128 ounces of baby food, but it was not enough, and they would not be able to get more until October 24, 2019. [Mother] showed a picture of Timothy to Ms. Cantrell and Ms. Cantrell testified that Timothy was wearing only a diaper, he was lying on his side, he was thin, and his abdomen was enlarged.

[Mother] said that Timothy was at work with his father whom she identified as "Andrew [C.]"[2] [Mother] said that [Father] was self-employed,

---

[2] Father and Mother had been married twice, once in 2008 when Father was using an admittedly stolen identity as Andrew C. and then again under Father's real name in 2017. Father (Roy C.) was named on Timothy's birth certificate as the father, but no father was named on Krystopher's birth certificate. Although Andrew C. was initially listed as a respondent in the pleadings and was the presumed legal father of both Children due to the first marriage, by the time of the termination trial, Andrew C. had been excluded

- 2 -

and he took Timothy to work with him. [Mother] said that Timothy would sleep in the car while [Father] worked.

[Mother] admitted that she had severe mental health concerns. [Mother] said that she would "self-destruct" things in the home, and she felt that it was better to punch and do things to the home instead of other people when she became overwhelmed. [Mother] described these episodes as "outrages." [Mother] admitted having an issue with anger and postpartum depression.

Ms. Cantrell asked [Mother] about any criminal history and [Mother] said that she was on probation for driving under the influence by consent in 2017. [Mother] explained that [Father] was arrested at the same time for driving under the influence.

Ms. Cantrell spoke to [Father] by telephone on October 17, 2019. [Father] immediately said that he was going to be filing a complaint with the health department because he felt like they had set them up for failure when they cut back the amount of the baby's formula. [Father] admitted that he and [Mother] gave Timothy 2% milk and water when the formula ran out. [Father] also told Ms. Cantrell that [Mother] was low-functioning and could not be trusted with the baby, so [Father] took Timothy to work with him.

Ms. Cantrell testified that her initial concerns were medical maltreatment of Timothy. Ms. Cantrell was especially concerned because she was not actually able to see the child. She felt that the case needed significant follow-up, but she was unable to provide that follow up because she was going to be out of town for the rest of the week. Ms. Cantrell consulted with her supervisor about her concerns and the case was assigned to another case manager for follow up.

CPS investigator Jennifer Adams testified next. Ms. Adams was the case manager that received the case after Ms. Cantrell. Ms. Adams spoke to [Father] by telephone on October 17, 2019. Ms. Adams explained her concerns with Timothy's weight and asked [Father] to take the child to the emergency room so that he could be seen by medical professionals. [Father] took the child to the emergency room at Harton Medical Center in Tullahoma, Tennessee, and Ms. Adams met him there. [Father], [Mother], and Timothy were at the emergency room together when Timothy was called

---

via DNA testing as the biological father to the Children and had executed denials of paternity. It is undisputed that by the time of trial, Father maintained the only remaining claim to paternity of the Children.

back to triage. Ms. Adams observed [Father] prepare a bottle for Timothy. He did not mix the formula correctly in that he put in less formula than was needed. Ms. Adams tried to explain to [Father] that he was not following the directions on the can of formula and [Father] did nothing to correct his mistake. Ms. Adams offered to provide formula if [Father] and [Mother] were unable to get it on their own but [Father] said that they could water down 2% milk and it was no problem.

Ms. Adams spoke to [Father] while at the emergency room, and he explained that when he lived in Alabama he had aliases and "Andrew [C.]" was one of those aliases. [Father] said that he served eleven months in prison and five years on probation. [Father] said that he is the primary caretaker for Timothy because [Mother] is "mentally [r . . . d] and a product of No Child Left Behind," so [Mother] is not able to take care of Timothy.

Timothy was weighed at the hospital, and he was approximately eleven pounds and in the second percentile for weight for a seven-month-old child. [Father] and [Mother] were instructed to follow up with their pediatrician the following day. Ms. Adams instructed [Father] and [Mother] to follow up with her once they had taken Timothy to the pediatrician.

Approximately two days later Ms. Adams went to the home and [Mother] was outside waving from the porch of her father's home nearby. [Mother's] father lived at the end of the same drive that led to the home of [Mother] and [Father]. [Mother] explained that there had been an incident the night before in which [Father] had been drinking and became irate. [Father] told [Mother] to leave the home which she did. She returned to the home to get the children and [Father] would not allow [Mother] to take the children. [Mother] eventually got the children back in her care and she and the children were at her father's home. Ms. Adams asked about domestic violence in the home and [Mother] said that [Father] would hit her on the sides of her body so that any bruises were hidden. Ms. Adams suggested that [Mother] go to a domestic violence shelter and tried to find a shelter that [had] space available for her.

[Mother] told Ms. Adams that Timothy had not been to the pediatrician because she did not have a vehicle. [Mother] told Ms. Adams that [Father] uses cocaine and [Mother] went to her bedroom closet and retrieved a glass pipe. [Mother] said that [Father] was at the Cannon County Sheriff's Department with Timothy to take out charges against [Mother] for

an incident that happened on July 5, 2019, in which [Mother] threw a pickle jar at [Father].

Ms. Adams went to the sheriff's department to speak to [Father]. [Father] said that [Mother] needed to learn a lesson and not hit people. [Father] admitted that there was domestic violence in the home but said that it was all because of [Mother] and [Father] was the victim. When Ms. Adams asked [Father] to submit to a drug screen he responded, "I will [p . . .] hot." [Father] admitted to smoking marijuana and asked if he could take a drug screen in a few days. When Ms. Adams told [Father] that a later drug screen was not an option [Father] admitted that he used cocaine two days prior. [Father] said that he had been using cocaine every couple of days for the last year to deal with [Mother]. He also admitted to regular use of alcohol to deal with [Mother].

Ms. Adams spoke with Krystopher [C.], age 11, on this date. Krystopher told Ms. Adams that his parents fight. Krystopher said that he did not usually see his parents fight because he stayed in his bedroom, but he had heard his father hit his mother. Ms. Adams testified that it was decided that the children should be removed from the home because of the drug use by [Father], the domestic violence, and the medical concerns for Timothy.

The depositions of Dr. Mary Palmer from August 10, 2020, and October 5, 2021, were entered as exhibits 14 and 15. Dr. Palmer testified in her deposition that Timothy has suffered developmental delay because he was deprived of proper nutrition for approximately 135 days. This deprivation of nutrition caused injury to his brain, which is serious bodily injury. Had this deprivation of food been allowed to continue, it could have resulted in the child's death, but it also would have resulted in severe developmental delay. Timothy became ill with a serious respiratory illness within a week or so of being in foster care. Dr. Palmer testified that this illness was a direct result of the malnutrition by his parents in that his body could not fight off the respiratory illness in this weakened state. Timothy spent several days in the intensive care unit with this illness. Dr. Palmer noted that Timothy gained 36 grams per day in the week after being removed from the parents. This is another indication that the child's poor weight gain was not due to anything other than not receiving the proper nutrition.

(Footnote omitted.) Regarding the situation at the time of the Children's removal, the trial court further found:

Also admitted for proof in the trial was the hair follicle drug screen that was taken on [Father] on November 4, 2019, in which [Father] was positive for cocaine. That was Exhibit 17. Exhibit 16 is the deposition of the scientist who certified the drug test, Dr. Engelhart. Both of those exhibits are proof of [Father's] cocaine use.

On October 23, 2019, the trial court entered an *ex parte* order, bringing the Children into the protective custody of the court and awarding temporary custody of the Children to DCS. In the protective custody order, the court appointed attorney Meredith Rambo as guardian *ad litem* ("GAL") to represent the Children's best interest. Setting the case for preliminary hearing, the court incorporated and adopted an affidavit of reasonable efforts filed by DCS, which stated that "due to the emergency of the removal," DCS had not provided services to the Parents prior to the removal.

In the protective custody order, the trial court notified the Parents of the obligation to provide child support for the Children and stated that support would be set during the preliminary hearing. The court also notified the Parents of the "Criteria and Procedures for Termination of Parental Rights." On November 7, 2019, the court entered an amended protective custody order, adding the following provision: "Contact between the Children and parents is to be directly supervised by [DCS] or a third party approved by [DCS]." DCS subsequently filed an amended dependency and neglect petition on July 28, 2020, adding facts regarding Timothy's care and diagnoses during two hospital admissions in November 2019.

On January 30, 2023, DCS filed in the trial court a petition to terminate the parental rights of Father and Mother to the Children. DCS alleged statutory grounds against both parents of severe child abuse of Timothy and failure to manifest an ability and willingness to assume custody of both Children. As to Father, DCS also alleged the ground of failure to establish parentage. DCS further alleged that it was in the Children's best interest for Father's and Mother's parental rights to be terminated.

Acting without benefit of counsel, the Parents filed a joint response opposing the petition on March 1, 2023. They alleged a conspiracy to destroy the family, alienate family members from one another, and "criminalize" Father. The Parents averred that fraud had been perpetuated on the trial court by DCS because DCS had filed the petition in the trial court after voluntarily nonsuiting a petition to terminate parental rights that had been previously filed in the Cannon County Circuit Court ("circuit court") in March 2021. The Parents primarily argued that an alleged lack of due process in their dependency and neglect case meant that the termination petition should be dismissed.

Despite this response from the Parents, DCS experienced some difficulty in serving Father with the termination petition. On March 10, 2023, the trial court entered an order (1) setting the termination petition for trial, (2) appointing Ms. Rambo to continue as the Children's GAL, (3) noting that Mother had been served with the petition in February 2023, and (4) directing that an alias summons be issued to Father. DCS subsequently filed an affidavit of diligent search and a motion to serve Father via publication. On March 21, 2023, the trial court entered an order for service by publication for four consecutive weeks in two newspapers, the *Cannon Courier* and the *Crossville Chronicle*. DCS subsequently filed affidavits executed by the publishers of those newspapers, indicating that publication of notice to Father had been completed as ordered.

Following a hearing, the trial court entered an order on May 9, 2023, granting a motion that had been filed by DCS to adopt permanency plan orders that had been entered by the circuit court in the previous termination action. Upon the GAL's motion, the trial court also ordered, *inter alia*, that (1) video calls between Mother and Timothy, which had been supervised by Timothy's foster mother ("Foster Mother"), were "to stop immediately due to concerns that Respondent Father, being in the same home as Respondent Mother, [had] access to listen and/or see and/or participate in such video calls against prior Court Orders"; (2) any future visitations between Mother and Timothy must be conducted in a public place; and (3) family counseling, which had been previously ordered, was no longer required "due to parents' interference and denial thereof."

In May 2023, the Parents, continuing to act *pro se* as the "United Respondents," filed a motion to conduct hearings via Zoom, a motion to remove the GAL, a motion to dismiss the termination petition, and an amended response to the petition. In support of their motion to dismiss, Father and Mother alleged grounds of "erroneous petition," "service of notice," "lack of jurisdiction," and "insufficiency of process/due process." They requested return of the "abducted" Children. In their amended response, the Parents focused much of their argument on clerical discrepancies in the filing of the termination petition and issues of proper notice. They also urged that rather than considering Timothy's medical history after removal, the trial court should consider medical records from when Father sought treatment for Timothy at Tennova Healthcare-Harton ("Tennova Harton"), where he had met Ms. Adams on October 17, 2019, and the next day in the emergency room at Saint Thomas Rutherford Hospital ("Saint Thomas Rutherford").

The Parents also filed an "Affidavit of Authorization," executed by Mother on May 4, 2023, wherein she purported to authorize Father, who is not a licensed attorney, "to submit responses and legal documents on [her] behalf" in this matter. On June 1, 2023, the Parents filed a "Motion for Relief," alleging, *inter alia*, dishonest practices on the part of DCS and intentional concealment of the medical records that Father had obtained regarding

Timothy prior to the Children's removal. The trial court entered an order appointing counsel to represent Mother on June 26, 2023.

On July 6, 2023, DCS filed a "Foster Care Review Summary" and a "Progress Report for Child in State Custody." These documents indicated that Krystopher had been placed at a youth center in Washington County since December 12, 2022. DCS reported that Krystopher was a straight-A student and was "academically on target." However, Krystopher was facing pending juvenile delinquency proceedings in Cumberland County. Timothy had been placed with Foster Mother since his removal from the Parents' home. According to these reports, Timothy was "doing well," "meeting his developmental goals," and "attend[ing] daycare." In the progress report, DCS noted that Father had been under a no-contact order that prohibited him from contacting the Children since August 20, 2020. Mother had been visiting Timothy in person for four hours per month and participating in video calls with him on alternate weeks. Mother also participated in video visits with Krystopher but refused to visit him in person at the youth facility. Mother did see Krystopher in person when he appeared in court in Cumberland County.

The progress report referenced "action steps" that each parent had been required to complete in a permanency plan developed for the family. Mother had completed some steps, including undergoing a clinical parenting assessment, establishing a home, completing domestic violence counseling, participating in an alcohol and drug assessment, taking recommended alcohol and drug education classes, and resolving her pending criminal charges without incurring new ones. The report further noted, however, that Mother's parenting assessment had revealed concerns regarding her ability to parent, that Mother had not followed through with recommendations for therapy, and that the presence of Father and "others" raised concern regarding the safety of her home. Additionally, Mother had reported to DCS that she was employed but had provided only one check stub in over a year.

As to Father, the report indicated that he had completed a psychological assessment and had made some progress toward resolving pending criminal charges. Otherwise, he had completed none of the required action steps. He had not provided documentation of alcohol and drug treatment, counseling, or current employment. Father had presented proof of completion of parenting classes, but Mother had reported to DCS that she had completed the parenting classes online for Father.

Following a hearing conducted on June 2, 2023, the trial court entered an order on July 10, 2023, *nunc pro tunc* to the date of the hearing. The court considered several motions that had been filed by Father or the Parents in both the dependency and neglect action and the termination action. As to the termination action, the court denied the Parents' motion to dismiss, specifically finding that "a clerical error in a case number does not

- 8 -

warrant a case dismissal." The court also denied a motion Father had filed to remove the GAL upon the court's determination that the GAL had "complied with all of the guidelines of Supreme Court Rule 40." The court granted a motion Father had filed to conduct hearings via Zoom except for the adjudicatory hearing in the dependency and neglect action and the final hearing in the termination action.

During the June 2023 hearing, the trial court also questioned the Parents regarding whether they intended to "knowingly and voluntarily waive[] their rights to appointed counsel." The court stated in its order:

> [Father] and [Mother] said that they did not waive their right to a court appointed attorney but did not necessarily want the court to appoint an attorney to represent them. [Father] said that he did not need an appointed attorney. [Mother] said that, if she had to have an attorney, she would like to have one appointed to her.

The court then appointed an attorney to represent Mother, and upon noting that Father "would not waive his right to an appointed attorney," appointed a separate attorney to represent Father. The court ultimately granted Mother's counsel permission to withdraw and substituted another attorney to represent Mother.

Following a hearing conducted on October 27, 2023, during which both parents were represented by counsel, the trial court entered an order on November 27, 2023, granting DCS leave to amend the termination petition. The court noted that DCS had moved to amend the petition to include the updated best interest factors provided in the April 2021 amendment to Tennessee Code Annotated § 36-1-113(i), which had been in effect at the time DCS filed the initial petition. In the November 27, 2023 order, the trial court also granted a motion filed by Father wherein he requested leave to represent himself, and the court relieved Father's counsel of further representation. The court further granted a motion filed by Mother's then-counsel to withdraw from representation of Mother. The court directed that the Parents could "hire any attorney that they wish[ed]" but that "no further appointments of counsel [would] be made" by the trial court. The court set the case for hearing on January 5, 2024, and denied Father's motion to participate in the termination trial via Zoom.

On November 27, 2023, DCS filed its amended petition. In addition to updating the best interest factors, DCS (1) removed Andrew C. as a respondent; (2) removed the ground previously alleged against Father of failure to establish parentage; and (3) added an alleged ground against both Parents of abandonment by failure to financially support the Children in the four months preceding the filing of the amended petition. DCS attached a certificate

of service to the amended petition stating that Mother and Father were served, respectively, at their home address.

Also on November 27, 2023, the Parents, acting *pro se* as the "collective respondents," filed a "Motion to Render a Decision," requesting a decision on their motion for relief. On December 29, 2023, the Parents filed a motion to continue the final hearing. They argued that a time span of "35 days," inclusive of the holiday season, between the November 27, 2023 order and the January 5, 2024 hearing date was insufficient for them to prepare. The Parents also asserted that the amended termination petition had not been properly served on them. The Parents filed a pre-trial brief on January 3, 2024.

The trial court conducted an adjudicatory hearing concerning the dependency and neglect petition and a bench trial concerning the termination petition on January 5, 2024. Neither Father nor Mother appeared for trial.[3] The transcript indicates that the trial court began the hearing by denying the Parents' motion to continue because they had not appeared to argue the motion. In the final judgment terminating parental rights, the court stated:

> The summons for [Mother] and the publication notices for [Father] clearly stated the date of the initial appearance and advised each party of his or her duty to file an answer within thirty days of service and that they must personally appear in court. The summons and publication notices also stated that his or her failure to answer or appear could result in the hearing going forward without his or her participation and in termination of parental rights. [Father] and [Mother] participated in the preliminary proceedings to terminate their parental rights; however, they did not appear on this date.

During trial, DCS presented testimony from Child Protective Services ("CPS") Investigator Alicia Cantrell, CPS Investigator Jennifer Adams, and Family Services Worker ("FSW") Julie Brown. DCS also presented numerous exhibits, including two deposition testimonies provided by Dr. Mary Palmer, who had treated Timothy in October

---

[3] In a motion filed after briefing of this appeal was complete, the Parents asserted that during the termination trial, they "were in the emergency room due to a documented medical emergency involving blood loss" and that the trial court "was notified of this emergency but refused to continue the hearing or permit rescheduling." There is no mention or documentation of this emergency or of notice to the trial court in the appellate record or the motion. We note nonetheless that "[d]ocuments included solely in an appendix to a party's brief or motion filed in the appellate court have not been properly supplemented to the record and will not be considered by this Court on appeal." *See Huron v. Kruglyak*, No. E2022-01812-COA-R3-CV, 2024 WL 1256449, at *9 (Tenn. Ct. App. Mar. 25, 2024) (citing Tenn. R. App. P. 24(a), (e); *Jennings v. Sewell-Allen Piggly Wiggly*, 173 S.W.3d 710, 712 (Tenn. 2005)).

and November of 2019, and the deposition testimony of Dr. David Engelhart, who had analyzed a drug screen administered to Father in November 2019.

The trial court entered a final order on March 8, 2024, terminating Father's and Mother's parental rights to the Children.[4] The court determined by clear and convincing evidence that DCS had proven the three statutory grounds pursued at trial. The court further found by clear and convincing evidence that termination of Father's and Mother's parental rights was in the Children's best interest.

Prior to entry of the final order, the Parents filed a premature notice of appeal with this Court. *See* Tenn. R. App. P. 4(d) ("A prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof."). On February 1, 2024, Mother filed a "Motion for a Stay Pending Appeal," requesting that visitation between Mother and the Children continue pending appeal. The Parents subsequently filed a request for appellate review of their motion for stay pursuant to Tennessee Rule of Appellate Procedure 7. On April 5, 2024, this Court entered an order denying the Parents' request for appellate review pursuant to Rule 7. Noting the Parents' *pro se* status, this Court remanded the case to the trial court to appoint new counsel to represent each parent on appeal. The trial court then appointed appellate counsel to separately represent Father and Mother.

However, upon the Parents' subsequent motion to waive their rights to appointed counsel, this Court entered an order on August 9, 2024, remanding the matter again to the trial court for a hearing and decision on the Parents' motion. Following a hearing, the trial court entered an order on October 18, 2024, accepting Father's and Mother's respective waivers of their rights to appointed counsel. This Court subsequently entered an order on October 28, 2024, recognizing the trial court's order and the Parents' *pro se* status. The Parents then proceeded with this appeal *pro se*.[5]

Mother and Father initially attempted to appeal both the dependency and neglect adjudication and the termination judgment in this appeal. On February 7, 2025, this Court entered an order transferring the Parents' appeal of the trial court's judgment adjudicating the dependency and neglect action to the circuit court pursuant to Tennessee Code Annotated § 37-1-159(a). The Parents have subsequently filed several pleadings during the pendency of this appeal urging this Court to review all proceedings in the dependency and neglect action in conjunction with their appeal of the termination judgment. However,

---

[4] The transcript indicates that the trial court also adjudicated the Children dependent and neglected as to Father and Mother.

[5] The Parents have submitted one principal and one reply brief on appeal with both of their signatures attached.

this Court does not have subject matter jurisdiction over the Parents' appeal of the juvenile court's judgment in the dependency and neglect proceedings, which must be appealed to the circuit court. *See* Tenn. Code Ann. § 37-1-159(a). Additionally, Tennessee Rule of Appellate Procedure 8A(c) excludes from the appellate record any portion of the file from a dependency and neglect case that has not been properly admitted into evidence during the termination of parental rights trial. *See In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004). For these reasons, all references to the dependency and neglect proceedings in this Opinion are for background purposes and are predicated upon documents presented as evidence during the termination trial, as well as testimony presented during the termination trial and the trial court's findings in its judgment terminating Father's and Mother's parental rights.

Following the entry of orders by this Court denying the Parents' various motions to supplement the record, the Parents filed a Tennessee Supreme Court Rule 10B motion for recusal of the appellate judges who had participated in an order entered on June 13, 2025. Upon consideration, the instant panel of judges denied the recusal motion, concluding that the Parents had not alleged any facts that would require the judges to disqualify themselves. *See Adams v. Dunavant*, 674 S.W.3d 871, 878-79 (Tenn. 2023) ("[T]he proponent of a recusal motion bears the burden of establishing that recusal is appropriate and any alleged acts of bias or prejudice arise from extrajudicial sources rather than from events or observations during the litigation of the case."). The panel then continued with the process of adjudicating this appeal.

As of the date of this Opinion, one pleading filed by the Parents prior to the filing of their recusal motion and one pleading filed after the recusal motion was denied remain outstanding for a decision by this Court. The first pleading is entitled, "Supplemental Constitutional Challenge Regarding the Court's Refusal to Consider the Dependency Record, False Certification of the Record, and Continued Denial of Supplementation." The remaining pleading is entitled, "Motion to Dismiss Case with Prejudice and Restore Custody due to Jurisdictional and Constitutional Defects." With careful consideration, particularly in light of the analysis to follow, this Court hereby DENIES the Parents' motion for supplementation, reconsideration, and constitutional objection and their motion to dismiss the case.[6] We note, however, that four of the documents that the Parents have requested for supplementation are in the record of the termination action before us as certified by the trial court clerk. These are:

- the trial court's July 10, 2023 Order, entered *nunc pro tunc* to June 2, 2023;
- the Parents' Motion to Render Decision, filed November 27, 2023;

---

[6] On June 29, 2025, the Parents filed with this Court a "Notice of Filing and Clarification of Existing Exculpatory Evidence in the Appellate Record." This document purports to be a notice of filing in federal court. No action from this Court is necessary.

- the Parents' Motion for Continuance, filed December 29, 2023; and
- the Parents' Pre-Trial Brief, filed January 3, 2024.

## II. Issues Presented

The Parents have presented the following issues on appeal, which we have consolidated, reordered, and restated as follows:

1. Whether the trial court erred by exercising subject matter jurisdiction over this parental rights termination action when a related dependency and neglect action had not yet been fully adjudicated.

2. Whether the trial court erred by allowing DCS to file a termination petition in the trial court after DCS had voluntarily nonsuited a previous termination petition in the circuit court.

3. Whether the trial court violated the Parents' due process rights by allowing DCS to file an amended termination petition, allegedly without sufficient notice or preparation time.

4. Whether the trial court erred by admitting into evidence (a) the testimonies of DCS investigator Cantrell, DCS investigator Adams, and DCS family services worker Brown; (b) Dr. Palmer's deposition testimonies; (c) Ms. Adams's affidavit of reasonable efforts; and (d) Father's November 4, 2019 drug test results and Dr. Engelhart's affidavit.

5. Whether the trial court erred in determining by clear and convincing evidence that Father and Mother had each abandoned the Children by failing to financially support them.

6. Whether the trial court erred in determining by clear and convincing evidence that Father and Mother had each committed severe child abuse against Timothy.

7. Whether the trial court erred in determining by clear and convincing evidence that Father and Mother had each failed to manifest an ability and willingness to personally assume legal and physical custody of or financial responsibility for the Children.

8. Whether alleged fraud committed upon the trial court invalidates the trial court's orders.

9. Whether alleged cumulative errors committed by the trial court require reversal of the trial court's judgment terminating parental rights.

DCS has presented three additional issues, which we have restated as follows:

10. Whether the trial court properly determined by clear and convincing evidence that termination of Father's and Mother's parental rights was in the Children's best interest.

11. Whether the Parents may collaterally attack the trial court's judgment by claiming ineffective assistance of their respective former counsel.

12. Whether the Parents have waived the issues that are not directly related either to the trial court's subject matter jurisdiction or to the court's findings regarding statutory grounds and the Children's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 507 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96,

97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).
>
> \* \* \*
>
> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence,"

- 15 -

including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

The Parents have also raised evidentiary issues on appeal, which we review according to an abuse of discretion standard. *See Biscan v. Brown*, 160 S.W.3d 462, 468 (Tenn. 2005). As this Court has explained:

> Trial courts are given wide latitude on evidentiary decisions and we will only overturn the trial court's decision upon a showing of an abuse of discretion. *Danny L. Davis Contractors, Inc. v. Hobbs*, 157 S.W.3d 414, 419 (Tenn. Ct. App. 2004). "The abuse of discretion standard requires us to consider: (1) whether the decision has a sufficient evidentiary foundation; (2) whether the trial court correctly identified and properly applied the appropriate legal principles; and (3) whether the decision is within the range of acceptable alternatives." *Id.* (citing *Crowe v. First Am. Nat'l Bank*, No. W2001-00800-COA-R3-CV, 2001 WL 1683710, at *9 (Tenn. Ct. App. Dec. 10, 2001)).

*McGarity v. Jerrolds*, 429 S.W.3d 562, 566 (Tenn. Ct. App. 2013).

We respect the Parents' decision to proceed without benefit of counsel. In reviewing pleadings, we "must give effect to the substance, rather than the form or terminology of a pleading." *Stewart v. Schofield*, 368 S.W.3d 457, 463 (Tenn. 2012) (citing *Abshure v. Methodist Healthcare-Memphis Hosp.*, 325 S.W.3d 98, 104 (Tenn. 2010)). Pleadings "prepared by pro se litigants untrained in the law should be measured by less stringent standards than those applied to pleadings prepared by lawyers." *Stewart*, 368 S.W.3d at 462 (citing *Carter v. Bell*, 279 S.W.3d 560, 568 (Tenn. 2009); *Hessmer v. Hessmer*, 138 S.W.3d 901, 903 (Tenn. Ct. App. 2003); *Young v. Barrow*, 130 S.W.3d 59, 63 (Tenn. Ct. App. 2003)). Parties proceeding without benefit of counsel are "entitled to fair and equal treatment by the courts," but we "must not excuse pro se litigants from complying with the same substantive and procedural rules that represented parties are expected to observe." *Hessmer v. Hessmer*, 138 S.W.3d 901, 903 (Tenn. Ct. App. 2003).

## IV. Threshold Issues

### A. Subject Matter Jurisdiction

The Parents contend that the trial court lacked subject matter jurisdiction over this parental rights termination action because in the related dependency and neglect action, the court purportedly failed to conduct a timely preliminary hearing and did not hold an adjudicatory hearing until the time of the termination trial. We review this issue as a threshold matter because "[t]he concept of subject matter jurisdiction involves a court's

lawful authority to adjudicate a controversy brought before it." *See Northland Ins. Co. v. State*, 33 S.W.3d 727, 729 (Tenn. 2000). "Whether a trial court has subject matter jurisdiction over a case is a question of law that we review de novo with no presumption of correctness." *Furlough v. Spherion Atl. Workforce, LLC*, 397 S.W.3d 114, 122 (Tenn. 2013).

As a juvenile court, the trial court maintains concurrent subject matter jurisdiction over parental rights termination cases with circuit and chancery courts. *See* Tenn. Code Ann. § 37-1-104(c) (West July 1, 2016, to current). The Parents do not challenge this statutory authorization. Instead, the Parents assert that "a juvenile court must enter an adjudicatory order finding a child dependent and neglected before obtaining jurisdiction over termination proceedings." We disagree. The Parents rely on Tennessee Code Annotated § 37-1-129 in support of their argument, but this statute does not address termination actions. Instead, it addresses, *inter alia*, when a juvenile court must make findings as to whether a child is dependent and neglected in an action alleging that the child is delinquent or unruly. *See* Tenn. Code Ann. § 37-1-129(a)-(b) (West, July 1, 2021, to current). Additionally, as DCS points out, an adjudication of dependency and neglect is a prerequisite for only two of the possible statutory grounds for termination of parental rights: abandonment by failure to provide a suitable home, *see* Tenn. Code Ann. § 36-1-113(g)(1), § 36-1-102(1)(A)(ii), and persistence of the conditions leading to removal, *see* Tenn. Code Ann. § 36-1-113(g)(3). DCS did not allege these grounds in the instant action.

The Parents posit that "termination of parental rights proceedings are a two-step process requiring (1) an adjudication that the child is dependent and neglected, and (2) a determination that termination is in the child's best interests." In making this argument, they rely on this Court's decision in *In re M.J.B.*, 140 S.W.3d 643. However, this "holding" is not found in *In re M.J.B.* or any other Tennessee case. Instead, the *M.J.B.* Court explained the two-step process in termination cases as follows:

> Parties who have standing to seek the termination of a biological parent's parental rights must prove two things. First, they must prove the existence of at least one of the <u>statutory grounds</u> for termination. Second, they must prove that terminating the parent's parental rights is in the child's best interests.

*In re M.J.B.*, 140 S.W.3d at 653 (citations omitted) (emphasis added). Upon careful review, we determine that the trial court maintained subject matter jurisdiction over this termination of parental rights proceeding and that such jurisdiction was not dependent upon adjudication of the related dependency and neglect action.

- 17 -

As noted previously, the Parents have repeatedly filed motions during the pendency of this appeal seeking to supplement the trial court's certified record with portions of the file from the dependency and neglect action that were not admitted into evidence during the termination of parental rights proceedings. This Court has denied such supplementation in the past and in this case to date. For example, in *M.J.B.*, the juvenile court clerk had improperly included documents from a related dependency and neglect action in the appellate record for the termination action at issue. *Id.* at 652. This Court addressed the effect of Tennessee Rule of Appellate Procedure 8A(c), which provides:

> In addition to the papers excluded from the record pursuant to Rule 24(a), any portion of a juvenile court file of a child dependency, delinquency or status case that has not been properly admitted into evidence at the termination of parental rights trial shall be excluded from the record.

*See In re M.J.B.*, 140 S.W.3d at 652. Although the *M.J.B.* Court exercised its discretion to separate the "extraneous materials" from those that were properly in the record and then disregard the materials that were not properly admitted during the termination proceedings, the Court held that "[i]n the future, the contents of the record on appeal in all cases involving the termination of parental rights must comply with this opinion and with proposed Tenn. R. App. P. 8A(c)." *Id.* Therefore, we emphasize that the trial court did not commit error by declining to include in the instant appellate record portions of the related dependency and neglect file that were not admitted into evidence during the termination trial.

### B. Effect of DCS's Voluntary Nonsuit in Circuit Court

The Parents argue that DCS should not have been allowed to file a petition for termination of parental rights in the trial court after voluntarily nonsuiting a previous termination petition filed in the circuit court. The Parents assert that DCS's filing of the petition in the trial court constituted improper "forum shopping" and violated principles of *res judicata*. The Parents present no authority to support their forum shopping allegation. We reiterate that circuit, chancery, and juvenile courts have concurrent jurisdiction over parental rights termination proceedings. *See* Tenn. Code Ann. § 37-1-104(c); *see, e.g.*, *In re Michaela V.*, No. E2013-00500-COA-R3-PT, 2013 WL 6096367, at *6 (Tenn. Ct. App. Nov. 19, 2013) (determining that when a termination petition "was no longer pending in the Juvenile Court upon [DCS's] voluntary dismissal of the initial termination petition," "a lack of further written notice to the Juvenile Court did not divest the Circuit Court of its concurrent jurisdiction" over a subsequent termination petition filed by DCS (citing Tenn. Code Ann. § 37-1-104(c)).

In support of their allegation regarding *res judicata* concerns, the Parents cite to a case that does not appear to exist. Nonetheless, we note that *res judicata* principles would have applied here only if the circuit court had entered a final judgment on the merits of the termination petition filed in that court. *See Regions Bank v. Prager*, 625 S.W.3d 842, 847-48 (Tenn. 2021). No such judgment was ever entered in the circuit court. "Generally speaking, '[w]hen a voluntary nonsuit is taken, the rights of the parties are not adjudicated, and the parties are placed in their original positions prior to the filing of the suit.'" *Flade v. City of Shelbyville*, 699 S.W.3d 272, 282 (Tenn. 2024) (quoting *Himmelfarb v. Allain*, 380 S.W.3d 35, 40 (Tenn. 2012)). The Parents' argument regarding DCS's voluntary nonsuit of the petition filed in circuit court is unavailing.

## C. Amended Termination Petition

The Parents contend that the trial court violated their due process rights by allowing DCS to file an amended termination petition in the trial court. They specifically argue that the amended petition was not properly served on them and that, given the amendments made to the original petition, the Parents were afforded insufficient time to prepare for the termination trial. DCS responds that the Parents were served with the amended petition five days before the trial court granted DCS permission to file it and that the Parents had sufficient notice of the changes. We consider this to be a threshold issue because the statutory grounds considered by the trial court were partially affected by the amendments to the petition.

"The requirement for service of process is a fundamental due process right and a well-established requirement under the Tennessee Rules of Civil Procedure." *Olivier v. City of Clarksville*, No. M2016-02474-COA-R3-CV, 2017 WL 3105617, at *6 (Tenn. Ct. App. July 21, 2017) (citing *Turner v. Turner*, 473 S.W.3d 257, 272 (Tenn. 2015)). As this Court has recently explained:

> Due process requires that 'all parties to litigation . . . receive notice of important hearings and other proceedings.'" *In re A.W.*, No. M2020-00892-COA-R3-PT, 2021 WL 4075102, at *5 (Tenn. Ct. App. Sept. 8, 2021) (quoting *Bryant v. Edwards*, 707 S.W.2d 868, 870 (Tenn. 1986)). The notice must be "'reasonably calculated[,] under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Id.* (quoting *Keisling v. Keisling*, 92 S.W.3d 374, 377 (Tenn. 2002)).

*In re William C.*, No. M2023-00646-COA-R3-PT, 2024 WL 1665737, at *3 (Tenn. Ct. App. Apr. 18, 2024).

In its November 27, 2023 order, the trial court directed that DCS "may amend the Petition to Terminate Parental Rights." *See* Tenn. R. Civ. P. 15.01 (providing for a party to amend a pleading upon leave of the court). The order was predicated on a hearing conducted on October 27, 2023, for which no transcript appears in the record. According to the court's order, counsel for each parent was present for the hearing, but Father and Mother were not present. In the same order, the court granted Father's pending motion to represent himself while also granting Mother's counsel's motion to withdraw. The certificate of service related to the order was dated November 22, 2023, executed by DCS's counsel, and noted service individually to Father and Mother at a home address on Northside Drive in Crossville, as well as to the "Former Attorney" for each parent. DCS filed its amended petition on the same day the order was entered, November 27, 2023, and it too was certified as served on the Parents at their Northside Drive address five days earlier on November 22, 2023.

The Parents maintain that "[t]he record contains no proof of service for the amended petition," citing to the trial transcript wherein DCS's counsel stated that the petition had been amended on November 27, 2023. It is not clear from their argument why the Parents cite this portion of the transcript or why they discount the certificate of service to them on the amended petition, which bore the same address as the certificate of service to them on the initial petition. The Parents state that service of the amended petition violated Tennessee Code Annotated § 36-1-124(d) because it was not served "in the same manner as the original petition." However, § 36-1-124 addresses the expedited nature of appeals concerning termination of parental rights, not amendments to complaints. Subsection (d), which was added by the General Assembly effective July 1, 2024 (after the instant amended petition was filed) provides: "A notice of appeal in a termination of parental rights action must not be filed by an attorney who is not specifically authorized by the appellant to file a notice of appeal on the appellant's behalf." The statutory section has no bearing on service of process.

In arguing that the amended petition was improper because it was not served "in the same manner" as the original petition, the Parents list changes between the original and amended petition. As noted previously, DCS amended its petition to reflect the updated best interest factors already in effect in Tennessee Code Annotated § 36-1-113(i)(1) when the original petition was filed. DCS also (1) removed Andrew C. as a respondent, (2) removed the ground previously alleged against Father of failure to establish parentage, and (3) added an alleged ground against both Parents of abandonment by failure to financially support the Children in the four months preceding the filing of the amended petition. The Parents posit that it was improper for DCS to add a statutory ground for termination in the amended petition, but they cite no viable authority for this postulate. Indeed, the addition of a statutory ground for termination of parental rights has been recognized by this Court as a consideration in determining whether an amended petition is "'separate and distinct

from the original'" such that the version of the statute in effect when the amended petition was filed should be applied. *See In re Liberty T.*, No. E2022-00307-COA-R3-PT, 2023 WL 2681897, at \*9 (Tenn. Ct. App. Mar. 29, 2023) (quoting *In re Ava M.*, No. E2019-01675-COA-R3-PT, 2020 WL 2560932, at \*14 (Tenn. Ct. App. May 20, 2020)). There is no prohibition against adding a statutory ground for termination of parental rights in an amended petition.

The Parents also advance the position that the trial court violated their due process rights by failing to afford them sufficient time to prepare a defense against the additional statutory ground of abandonment through failure to support. The Parents assert that, considering intervening holidays and weekends, they had only twenty-three "judicial" or "business" days between November 27, 2023, and January 5, 2024, in which to prepare. DCS points out that considering the certificate of service dated November 22, 2023, the Parents had forty-four days to prepare for trial after being served with the amended petition. Generally, when computing time for the purpose of complying with the Tennessee Rules of Civil Procedure, the last day of a period is not computed if "it is a Saturday, a Sunday, or a legal holiday," but intervening days are included even if they fall on weekends or holidays. *See* Tenn. R. Civ. P. 6.01.

However, the due process standard here is not a finite time period but instead whether the Parents were given an opportunity to have their defenses heard "at a meaningful time and in a meaningful manner." *See In re Walwyn*, 531 S.W.3d 131, 138 (Tenn. 2017) ("[P]rocedural due process ensures that litigants are 'given an opportunity to have their legal claims heard at a meaningful time and in a meaningful manner.'" (quoting *Lynch v. City of Jellico*, 205 S.W.3d 384, 391 (Tenn. 2006))). Even assuming, *arguendo*, that the Parents did not receive notice of the amended petition until it was filed on November 27, 2023, we determine that this notice of nearly forty days was sufficient for the Parents to have their defenses heard in a meaningful manner.[7]

The Parents presented essentially the same argument concerning the number of days they had to prepare their defenses in their motion to continue the trial, filed on December 29, 2023. They also filed a pre-trial brief on January 3, 2024, again reiterating this argument. However, the Parents failed to appear on the day of trial when they were afforded an opportunity to argue in support of their motion to continue. The trial court denied a continuance due to the Parents' failure to appear. The Parents have not raised an

---

[7] DCS maintains that the Parents also had notice that "their failure to pay child support would be litigated" because the initial petition contained factual allegations that Father had failed to pay any child support and that Mother had failed to pay child support consistent with the Tennessee Child Support Guidelines. Although it is true that the Parents were aware of these factual allegations from the initial petition, we do not find that these allegations constituted sufficient notice that DCS would be pursuing the statutory ground of abandonment through failure to support at trial.

issue concerning their motion for continuance in their statement of the issues, and we therefore find any challenge to the denial of the motion to have been waived. *See Hodge v. Craig*, 382 S.W.3d 325, 334 (Tenn. 2012) ("Appellate review is generally limited to the issues that have been presented for review."). Furthermore, "[t]he decision of whether to grant or deny a motion for a continuance is fully within the discretion of the court." *See In re William C.*, 2024 WL 1665737, at *4 (citing *Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 415 (Tenn. 1997)). The Parents are not entitled to relief on this issue.

### D. Ineffective Assistance of Counsel

The Parents have not raised an issue in their statement of the issues regarding ineffective assistance of counsel. However, they include a section preceding the conclusion of their principal brief that is entitled, "Ineffective Assistance of Counsel Deprived Appellants of Due Process and Fundamental Fairness." The Parents assert that "[o]ver five years of proceedings, 15+ court-appointed attorneys" failed to file needed pleadings and cross-examine deposition witnesses. They further assert that their court-appointed attorneys were in "[c]ollusion with [p]rocedural [v]iolations." This Court may consider an issue waived when an appellant fails to include it in his or her statement of the issues. *See Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) ("We may consider an issue waived where it is argued in the brief but not designated as an issue."). However, in this case, DCS has responded by directly raising the issue on appeal of whether the Parents may collaterally attack the trial court's judgment by claiming ineffective assistance of their respective former counsel. Because DCS has specifically raised this issue and because the Parents' assertion of ineffective assistance also permeates their arguments on other issues, we address it here before proceeding to review the trial court's findings on the statutory grounds for termination.

DCS relies on our Supreme Court's decision in *In re Carrington H.*, 483 S.W.3d at 535, to posit that the Parents have no right to collaterally attack the trial court's termination judgment based on ineffective assistance of counsel. The *Carrington* holding is not quite that simple. In *Carrington*, our Supreme Court considered the issue of "whether an indigent parent's right to appointed counsel in a parental termination proceeding includes the right to challenge an order terminating parental rights based on ineffective assistance of trial and appellate counsel." *Id.* at 511. The Court held:

> Given the existing procedural safeguards applicable to parental termination proceedings, we decline to hold that securing the constitutional right of parents to fundamentally fair procedures requires adoption of an additional procedure, subsequent to or separate from an appeal as of right, by which parents may attack the judgment terminating parental rights based upon ineffective assistance of appointed counsel.

*Id.* at 539. The *Carrington* Court proceeded to conduct an "independent review of the record on appeal" to address the mother's "assertion that her counsel's representation denied her a fundamentally fair proceeding." *Id.* at 535; *see generally In re Kayleigh B.*, No. E2019-01153-COA-R3-PT, 2020 WL 1491375, at *8 (Tenn. Ct. App. Mar. 27, 2020) (surveying Tennessee decisions applying the *Carrington* holding concerning claims of ineffective assistance of counsel).

In conducting its review, the *Carrington* Court explained that the mother's "assertion that she [was] entitled to relief from the judgment terminating her parental rights based on appointed counsel's inadequate representation in the . . . dependency and neglect proceeding" was not properly before the Court. *In re Carrington H.*, 483 S.W.3d at 536. Explaining that "[d]ependency and neglect proceedings are separate and distinct from proceedings to terminate parental rights," our Supreme Court determined that "any assertion regarding counsel's allegedly deficient representation in the earlier dependency and neglect proceeding is not properly before us in this appeal." *Id.* Upon reviewing the record in the termination proceeding, the *Carrington* Court concluded that "appointed counsel's representation did not deny Mother a fundamentally fair parental termination proceeding." *Id.* at 539.

In this case, the Parents are not entitled to an additional procedure, separate from their appeal as of right, to review their claim of ineffective assistance of counsel. *See id.* However, this Court may review the Parents' claim of ineffective assistance of counsel within our consideration of whether the Parents were denied "a fundamentally fair parental termination proceeding." *See id.* This review must be confined to the termination proceedings before us in the record. *See id.* at 536. The Parents have attempted to claim that "15+" appointed attorneys over the course of "[o]ver five years" were ineffective in representing them, beginning with the dependency and neglect proceedings.[8] The Parents' assertions regarding their respective attorneys' actions during any proceeding other than the subject termination proceeding are not properly before this Court. *See id.*

Our review of the record for this termination action indicates that the Parents initially responded to DCS's filing of the January 30, 2023 termination petition by filing a *pro se* response. The trial court appointed the GAL as counsel to represent the Children's best interests on March 10, 2023. However, Father avoided providing contact information for service of the petition, and service upon him was ultimately accomplished through publication in March 2023. The Parents, acting without counsel as "United Respondents," filed multiple motions in May 2023, including a motion to dismiss the termination petition and an amended response to the petition. Mother attached an affidavit to the amended

---

[8] The trial court credited Ms. Brown's testimony that Father had "filed multiple complaints on DCS workers, DCS attorneys, and attorneys who had been appointed to represent him in the past."

response wherein she purported to authorize Father to "submit responses and legal documents on [her] behalf."

The Parents appeared during the June 2023 hearing when the trial court questioned each of them regarding whether they intended to "knowingly and voluntarily waive[] their rights to appointed counsel." The court recorded in its order that Father had stated that "he did not need an appointed attorney" but also did not wish to waive his right to one. Mother had told the court that "if she had to have an attorney, she would like to have one appointed to her." The court appointed separate counsel to represent Father and Mother. Due to a time conflict, the court subsequently granted Mother's counsel's motion to withdraw and substituted new counsel for her in August 2023.

By the time the trial court conducted the October 27, 2023 hearing, Father had filed a motion requesting leave to represent himself, and Mother's counsel had filed a motion to withdraw from representation due to "a conflict of interest." Upon granting Father's motion to represent himself and Mother's counsel's motion to withdraw, the court stated that the Parents could "hire any attorney that they wish[ed]" but that "no further appointments of counsel [would] be made" by the trial court. The Parents continued to represent themselves through the date of trial and the filing of a premature notice of appeal. Although the Parents filed pleadings up to the time of trial, including a motion to continue the trial date and a pre-trial brief, they failed to appear on the day of trial. They thereby lost the opportunity to argue in favor of their motion to continue, to cross-examine DCS's witnesses, to challenge DCS's evidence presented at trial, or to present their respective defenses.

During the pendency of this appeal, this Court *sua sponte* entered an order on April 5, 2024, remanding the case to the trial court for new counsel to be appointed to represent Father and Mother on appeal. On remand, the trial court appointed separate counsel to represent each parent, and those appointments were finalized in an order entered on April 29, 2024. The Parents subsequently filed a motion to waive their rights to appointed counsel, and this Court entered an order remanding to the trial court for a hearing concerning the Parents' motion. Following a hearing on remand, the trial court entered an order on October 18, 2024, accepting Father's and Mother's respective waivers of counsel for the appeal and relieving their appointed counsel. The Parents participated in the hearing via video and presented executed waivers. This Court entered an order on October 28, 2024, recognizing the Parents' *pro se* status, and the Parents then proceeded with this appeal *pro se*.

Upon thorough review of the record, we conclude that the Parents have consistently rejected assistance from appointed counsel during the underlying parental rights termination proceeding and this appeal. Although counsel was appointed at various stages

in the proceeding, the Parents continued to act on their own, causing inherent conflict for counsel and ending attorney-client relationships almost before they had begun. This Court and the trial court took appropriate steps to ensure that the Parents were knowingly waiving their respective rights to appointed counsel, and the Parents did so. We therefore determine that the Parents were not denied a fundamentally fair parental termination proceeding action through ineffective assistance of counsel. *See In re Carrington H.*, 483 S.W.3d at 539.

## V. Evidentiary Issues

The Parents contend that the trial court erred by admitting into evidence at trial (a) the testimonies of Ms. Cantrell, Ms. Adams, and Ms. Brown; (b) Dr. Palmer's deposition testimonies; (c) Ms. Adams's affidavit of reasonable efforts; and (d) Father's November 4, 2019 drug test results. They argue that the DCS workers' testimonies, Dr. Palmer's depositions, and Ms. Adams's affidavit were replete with speculation and hearsay and that the methodology of Dr. Palmer's evaluations of Timothy's condition was flawed. They challenge the deposition of Dr. Engelhart, the chemist who analyzed Father's drug test. The Parents assert that because Father was not represented during Dr. Engelhart's deposition, Father did not have the opportunity to question, *inter alia*, the methodology of the testing or the chain of custody of the sample. The Parents also allege a procedural due process error because Mother was purportedly not represented by counsel during Dr. Palmer's first deposition in August 2020.[9] DCS responds that the Parents have waived their evidentiary issues by failing to raise them at the time of trial and at the time the evidence was admitted. Upon careful review, we agree with DCS's waiver argument.

As this Court has explained:

> Various rules govern whether a party has waived an issue on appeal. Issues "'raised for the first time on appeal are waived.'" *Martin v. Rolling Hills Hosp., LLC*, 600 S.W.3d 322, 336 (Tenn. 2020) (citation omitted). A party also waives evidentiary issues if he "fails to make an offer of proof" in the trial court. *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001); *see* Tenn. R. Evid. 103(a)(2). And a party "who failed to take whatever action [that] was reasonably available to prevent . . . an error" waives the issue. Tenn. R. App. P. 36(a); *see Godbee v. Dimick*, 213 S.W.3d 865, 897 (Tenn.

---

[9] DCS states in its appellate brief that Mother was represented by counsel at both of Dr. Palmer's depositions, which were conducted via video conference. The court reporter listed Mother's counsel as present during both the August 2020 and October 2021 depositions. Mother's counsel did not speak during the August 2020 deposition, although Mother's subsequent counsel thoroughly cross-examined Dr. Palmer during the October 2021 deposition. Father's counsel thoroughly cross-examined Dr. Palmer during both depositions.

Ct. App. 2006) (explaining that a party cannot "'take advantage of errors which he himself committed, . . . or which were the natural consequence of his own neglect'" (citation omitted)).

*Goodrich v. Morgan*, No. E2021-01045-COA-R3-CV, 2022 WL 3592612, at *2 (Tenn. Ct. App. Aug. 23, 2022). Specifically as to the admission of evidence, "Tennessee law requires a timely and specific objection in the trial court to preserve an evidentiary issue for appellate review." *See State v. Reynolds*, 635 S.W.3d 893, 930 (Tenn. 2021) (citing Tenn. R. Evid. 103(a)); *see also Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d 896, 907, n.10 (Tenn. 1996) ("Obviously plaintiff was required to object to the evidence at the time of its admission in order to preserve its introduction as error." (citing Tenn. R. Evid. 103(a)(1))).

The Parents assert that they have "preserved" issues throughout the pendency of the termination proceedings, pointing to the various pleadings they have filed. However, to preserve evidentiary issues occurring during trial, they needed to be present at the trial, raising objections during testimony and as exhibits were proffered. The Parents did not appear after they had waived their opportunity to have counsel represent them, and they did not appear to argue the motion to continue they had filed. Accordingly, the Parents failed to object to testimony or other evidence at the time of admission, *see* Tenn. R. Evid. 103(a), and failed "to take whatever action was reasonably available to prevent or nullify the harmful effect" of the errors they allege, *see* Tenn. R. App. P. 36(a). The Parents' evidentiary issues are deemed waived.

## VI. Statutory Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2023, to June 30, 2024)[10] lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)    The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship

---

[10] Unless otherwise noted, throughout this Opinion all citations to any section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on the date the amended termination petition was filed in the trial court and not to any other version of the statute. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *4, n.6 (Tenn. Ct. App. Aug. 5, 2023). In some instances, the subsection that was in effect at that time has not changed and therefore remains current or the subsection did not substantively change between the filing of the original and amended petitions.

rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4 . . . .

\* \* \*

(c)     Termination of parental or guardianship rights must be based upon:

    (1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

    (2)     That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of three statutory grounds to terminate Father's and Mother's parental rights: (1) abandonment through failure to financially support the Children, (2) severe child abuse, and (3) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children. We will address each statutory ground in turn.

## A.  Abandonment through Failure to Support

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g) provides in relevant part:

(g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

    (1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

Regarding the definition of abandonment applicable to this ground, Tennessee Code Annotated § 36-1-102(1)(A)(i)(a) (West July 1, 2023, to June 30, 2024) provides:

If the child is four (4) years of age or more, for a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the

parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child; . . .

Subsection (a) applies here because at the time of the amended petition's filing, Timothy was four years of age, and Krystopher was fifteen years old.

The trial court found that Father and Mother had each "failed to make reasonable payments towards the support of the children for the four months immediately preceding the filing of the petition for termination of . . . parental rights." As DCS acknowledges on appeal, the trial court erroneously identified the statutorily determinative period as the four months preceding the filing of the original petition. Inasmuch as this ground was added in the amended petition, the determinative period was the four months preceding the filing of the amended petition. *See, e.g.*, *In re Chase L.*, No. M2017-02362-COA-R3-PT, 2018 WL 3203109, at *9 (Tenn. Ct. App. June 29, 2018) (concluding that the four months preceding the filing of the amended petition was the determinative period when the statutory ground at issue had been set forth for the first time in the amended petition). We therefore conclude that the beginning point of the determinative period was July 27, 2023, and the ending point was November 26, 2023, the day before the amended termination petition was filed ("Determinative Period"). *See In re Joseph F.*, 492 S.W.3d 690, 702 (Tenn. Ct. App. 2016). Because we discern that the trial court's findings regarding this statutory ground are inclusive of the Determinative Period, we determine the trial court's identification of the wrong four-month period to be harmless error. *See, e.g.*, *In re Liberty T.*, 2023 WL 2681897, at *6; *In re Ima D.*, No. M2021-00022-COA-R3-CV, 2021 WL 5441832, at *4 (Tenn. Ct. App. Nov. 22, 2021).

Tennessee Code Annotated § 36-1-102(1)(D) provides the following definition concerning a parent's failure to support:

For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's support" means the failure, for the applicable time period, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant time period[.]

Support is considered "token" when "the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). The statute further provides:

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102(1)(I). The trial court determined by clear and convincing evidence that Father's and Mother's parental rights to the Children should be terminated based on this statutory ground.

### 1. Father

The trial court found as to Father in pertinent part:

> [Father] failed to support or make reasonable payments toward the support of the children. [Father] knew that his children were in foster care. [Father] is over 18 years old and is presumed to have knowledge of his duty to support his children pursuant to Tenn. Code Ann. § 36-1-102(1)(H). [Father] knew the consequence of failing to support his children because he had been given the Criteria and Procedures for Termination of Parental Rights on December 4, 2019. [Father] did not provide any justifiable excuse for not paying any child support. The Court finds that [Father] failed to support the children as required by Tenn. Code Ann. § 36-1-102(a)(1)(A) and Tenn. Code Ann. § 36-1-113(g)(1) and his parental rights should be terminated.

As noted above, the trial court erroneously considered the four-month period preceding the filing of the original petition in January 2023. However, we determine that the court's findings encompassed the entire period the Children were in protective custody, inclusive of the Determinative Period preceding the filing of the amended petition. *See In re J'Khari F.*, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *9 (Tenn. Ct. App. Jan. 31, 2019) ("[T]his Court has also determined that a miscalculation of the relevant four-month period can be considered harmless when the trial court made sufficient findings of fact that encompassed the correct determinative period."). The record contains no documentation of child support payments or any other type of support provided by Father during the more than four years the Children were in protective custody prior to trial.

The Parents argue that the trial court erred in finding clear and convincing evidence of this ground for either parent because (1) there was no court order for child support and (2) there was no evidence that the failure to support was willful. These arguments are unavailing. First, it is well settled in Tennessee that every parent is presumed to have knowledge of a parent's duty to support his or her minor children regardless of whether a court order to that effect is in place. *See* Tenn. Code Ann. § 36-1-102(1)(H) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]"); *see, e.g.*, *In re Kierani C.*, No. W2020-00850-COA-R3-PT, 2021 WL 4057222, at *11 (Tenn. Ct. App. Sept. 3, 2021). Furthermore, at trial, DCS presented a document entitled "Criteria and Procedures for Termination of Parental Rights," which Ms. Brown testified she had reviewed with the Parents. On December 4, 2019, Father and Mother had each signed the acknowledgment of receipt of the criteria and procedures, which informed the Parents that failure to pay child support may be a ground for termination of parental rights.

Second, much of the Parents' argument centers on their assertion that no proof is in the record regarding lack of willfulness. The Parents rely on Tennessee case law that predated the General Assembly's July 2018 amendment to the statute that rendered lack of willfulness an affirmative defense to abandonment through failure to visit or support. *See* Tenn. Code Ann. § 36-1-102(1)(I). The Parents did not file an answer to the amended termination petition, and they did not raise lack of willfulness as an affirmative defense in their pretrial brief. *See* Tenn. R. Civ. P. 8.03 (providing that "[i]n a pleading to a preceding pleading, a party shall set forth affirmatively facts in short and plain terms relied upon to constitute" any "matter constituting an affirmative defense"). The Parents also did not appear for trial to attempt raising the affirmative defense there or present any evidence to support the defense. *See* Tenn. Code Ann. § 36-1-102(1)(I) ("The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful.").

A preponderance of the evidence demonstrated that Father did not pay child support during the Determinative Period, was presumed to have knowledge of his duty to pay support, and had actual knowledge that failure to pay support could result in termination of his parental rights. Furthermore, Father failed to raise the affirmative defense of lack of willfulness. Based on our thorough review of the evidence, we conclude that the trial court did not err in finding, by clear and convincing evidence, that Father had abandoned the Children by failing to financially support them.

## 2. Mother

The trial court made parallel findings concerning Mother's failure to provide child support. However, the court did find that Mother had "made one payment of child support

in the amount of $143.63" during the four months preceding the filing of the initial petition. Ms. Brown testified that Mother had tendered this payment in November 2022. Considering this payment to have occurred during the relevant statutory period, the trial court ruled that the payment constituted token support and did not represent "reasonable payments toward the support" of the Children. The record contains no other evidence that Mother made child support payments during the entire time the Children were in protective custody. Accordingly, there is no evidence that Mother paid monetary child support during the actual Determinative Period preceding the amended petition's filing.

The trial court also found that Mother had not provided "in-kind" support for the Children. *See In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *18 (Tenn. Ct. App. July 21, 2021) ("This Court has previously held that support need not be solely monetary, but can include in-kind gifts." (citing *In re Kaleb N.F.*, No. M2012-00881-COA-R3-PT, 2013 WL 1087561, at *23 (Tenn. Ct. App. Mar. 12, 2013))). Ms. Brown testified that Mother had sent Krystopher "a couple of things through the mail, like, around his birthday or if it was Halloween . . . she's sent him a few things, but not anything that is of significant amount." Ms. Brown reported that Mother would sometimes bring books for Timothy to her visits with him. However, Ms. Brown also testified that Mother did not provide for other activities and never provided necessities such as school supplies. In its findings regarding the statutory best interest factor that involves child support, *see* Tenn. Code Ann. § 36-1-113(i)(1)(S), the trial court found that Mother "provided Halloween presents and some birthday presents, but those gifts were token." Although there is no specific evidence in the record that Mother had provided any items to the Children during the Determinative Period, we note that both Halloween and Krystopher's birthday fell within that time period.

Despite the Parents' waiver of the affirmative defense of lack of willfulness, DCS maintained the burden to prove that any items provided to the Children by Mother during the Determinative Period constituted token support. *See In re Lauren F.*, No. W2020-01732-COA-R3-PT, 2021 WL 5234712, at *10 (Tenn. Ct. App. Nov. 10, 2021) (noting that the burden remained on the petitioners to prove that the father's payments constituted token support). As this Court has previously explained, "token support" and "willfulness" are related but distinct concepts. *See In re Josiah T.*, No. E2019-00043-COA-R3-PT, 2019 WL 4862197, at *7 n.6 (Tenn. Ct. App. Oct. 2, 2019). Although petitioning parties such as DCS no longer bear the burden of proving that the respondent parent "willfully" failed to provide support, the petitioner must still present evidence of the parent's means when alleging that the support provided was merely "token."

According to the statute, "'token support' means that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B) (emphasis added). A parent's means includes "both income

and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013)). Furthermore, "[d]etermining a parent's available income and expenses is crucial for determining whether support is 'token.'" *In re Madison J.*, No. M2019-01188-COA-R3-PT, 2020 WL 4279791, at *7 (Tenn. Ct. App. July 24, 2020).

During trial, DCS presented no evidence concerning Mother's income or expenses, or more generally demonstrating her ability to provide support, during the Determinative Period. Inasmuch as the evidence supports a finding that Mother provided some items to the Children during the Determinative Period, we conclude that DCS failed to carry its burden to establish that these items constituted mere token support given Mother's means. Furthermore, although the trial court found the items provided by Mother to be token, the court did not make specific findings regarding Mother's ability to provide more substantial support. We therefore reverse the trial court's finding that Mother had abandoned the Children by failing to financially support them. *See, e.g.*, *In re Stephen H.*, No. M2022-00674-COA-R3-PT, 2022 WL 17843018, at *7 (Tenn. Ct. App. Dec. 22, 2022) ("Inasmuch as DCS failed to present evidence of [the parent's] living expenses during the Determinative Period, we cannot conclude that [the parent's] $75.00 contribution constituted token support and consequently reverse this statutory ground for termination.").

## B. Severe Child Abuse

The trial court found clear and convincing evidence that Father and Mother had committed severe child abuse against Timothy. Regarding this ground for termination of parental rights, Tennessee Code Annotated § 36-1-113(g)(4) provides:

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

As relevant to this action, the version of Tennessee Code Annotated § 37-1-102(b)(27) (West July 1, 2022, to May 4, 2023) that was in effect when the initial petition was filed defined "severe child abuse" as:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
>
> (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(c);

- 32 -

(B)     Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct[.]

Tennessee Code Annotated § 39-15-402(c) (West July 1, 2019, to current) provides the following definition:

"Serious bodily injury to the child" includes, <u>but is not limited to</u>, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects and acts of female genital mutilation as defined in § 39-13-110.

(Emphasis added.)

Moreover, as our Supreme Court has recently elucidated:

We hold that, for severe child abuse, a person's conduct is considered "knowing," and a person is deemed to "knowingly" act or fail to act, when he actually knows of relevant facts, circumstances or information, or when he is either in deliberate ignorance of or in reckless disregard of such facts, circumstances, or information presented to him. Under this standard, the relevant facts, circumstances, or information would alert a reasonable parent to take affirmative action to protect the child. For deliberate ignorance, a parent can be found to have acted knowingly when he has specific reason to know the relevant facts, circumstances, or information but deliberately ignores them. For reckless disregard, if the parent has been presented with the relevant facts, circumstances, or information and recklessly disregards them, the parent's failure to protect can be considered knowing.

*In re Markus E.*, 671 S.W.3d 437, 444 (Tenn. 2023).

In determining that Father and Mother had each respectively committed severe child abuse against Timothy, the trial court found:

- 33 -

The Court finds that [Mother] and [Father] have committed severe child abuse against Timothy. The Court adopts the depositions from Dr. Palmer contained in Exhibits 14 and 15 and finds that they are very credible. [Mother] and [Father] deprived Timothy of proper nutrition for 135 days. That deprivation of nutrition resulted in serious bodily injury and developmental delays. Had it not been for the intervention of [DCS], this deprivation of nutrition could have resulted in the child's death. Furthermore, the malnutrition of the child was a direct cause of a serious respiratory illness that the child suffered. This illness caused the child to be in the intensive care unit for several days. Therefore, the parental rights of [Mother] and [Father] should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(4).

Upon thorough review of Dr. Palmer's depositions and the record, we conclude that the evidence clearly and convincingly supported the trial court's findings.

Dr. Palmer's two depositions were taken on August 10, 2020, and October 5, 2021, respectively. She testified to essentially the same conclusions regarding Timothy's condition in both depositions. At the time of her depositions, Dr. Palmer had practiced as a physician at East Tennessee Children's Hospital ("ETCH") since 1990 and was a board-certified specialist in pediatric emergency medicine and child abuse pediatrics. DCS offered Dr. Palmer as an expert in child abuse pediatrics, and the trial court credited Dr. Palmer's testimony as an expert. Although we generally afford "deference to the trial court's determinations regarding credibility," *see Jones*, 92 S.W.3d at 838, when "'a trial court's findings of fact [are] based on documentary evidence such as depositions, transcripts, or video recordings,' we may draw our 'own conclusions with regard to [its] weight and credibility,'" *see Plofchan v. Hughey*, No. M2021-00853-COA-R3-CV, 2024 WL 64164, at *4 (Tenn. Ct. App. Jan. 5, 2024) (quoting *Kelly v. Kelly*, 445 S.W.3d 685, 693 (Tenn. 2014)).

Dr. Palmer testified that she initially evaluated Timothy in the clinic at ETCH on October 28, 2019, after she had been contacted by a DCS worker on October 23, 2019. During her evaluation, she had access to "records that had been submitted from his primary care provider and from one of the ERs [emergency rooms] that he had been seen in the week previously." In addition to conducting a physical examination, Dr. Palmer spoke with Foster Mother concerning how Timothy had been eating in the days since removal from the Parents' home and evaluated radiological skeletal surveys and blood work taken on the day of her evaluation. Prior to the first deposition, Dr. Palmer reviewed the record from the emergency room visit at Saint Thomas Rutherford, where Father had taken Timothy the day after meeting Ms. Adams at Tennova Harton. Dr. Palmer also reviewed records of Timothy's treatment since he had been in foster care for breathing problems that required

treatment at ETCH and speech, physical, and occupational therapy appointments conducted at Cookeville Regional Medical Center.

Dr. Palmer testified that Timothy had been born prematurely at thirty-four weeks' gestation and that his birth weight was four pounds, eight ounces, or 2.045 kilograms. Reviewing notes from the primary care provider ("PCP"), Dr. Palmer stated that Timothy had gained weight adequately when he was checked during two early appointments. He was put on formula on April 19, 2019, after he was brought in with a complaint of being gassy, fussy, and having loose stools. The PCP records indicated that Timothy was a "no-show" for his two-month check-up appointment three times and was next seen at nearly three months old on June 11, 2019. At that time, the PCP noted that Timothy's "weight gain was somewhat less of a curve" at 3.7 kilograms. The PCP's office scheduled a circumcision appointment at Mother's request and a four-month check-up, but Timothy did not show for either appointment. The PCP's records reflected no further appointments. Dr. Palmer acknowledged that although she did not have records from the Health Department, it was her understanding that the Parents had taken Timothy there for immunizations in October 2019 and that the Health Department had subsequently contacted DCS requesting a welfare visit.

The next medical record reviewed by Dr. Palmer was from Timothy's visit to the emergency room at Tennova Harton on the day of the DCS welfare visit in October 2019. Dr. Palmer reported that the nurse had noted that "the patient's father was adamant about staff not speaking to the DCS worker." The examination at Tennova Harton indicated that Timothy's "weight was 4.99 kilograms, and he appeared well hydrated and not in any distress." Dr. Palmer acknowledged that the exam report indicated "[a]ll the other terms that we use for looking pretty good:  alert, awake, nontoxic, playful, well hydrated." However, Dr. Palmer emphasized that the Tennova Harton staff "did get an impression of failure to thrive in a newborn and instructed to follow up with the primary care provider the day following."

According to Dr. Palmer, when she examined Timothy on October 28, 2019, his weight and length were at the zero percentile, but his head circumference was at the sixteenth percentile. She opined that this discrepancy was related to malnutrition. Timothy weighed 5.72 kilograms at that time. Dr. Palmer explained regarding the effect of Timothy's premature birth on his weight at seven months:

> So you have to take into account that he was a premature baby as well. So he would be about a month delayed in his growth, at a minimum. So at seven months of age, he would be corrected a month still, but he would be – so if he reached the 2nd percentile, which kind of puts you on the curve for

a baby his age of six months corrected, he would have weighed about 6.4 kilos.

Dr. Palmer also observed that Timothy had a "more pronounced flattened back of the head," explaining:

[T]he position that we hope for babies to be in safely for sleep is on their back. So it's not uncommon these days to have kind of a flattened back of the head. Babies that are left like that, though, and don't spend time on their tummy or by his age rolling around will have a more pronounced flattened back of the head, which his appeared to me to be.

Dr. Palmer stated the following as her diagnoses of Timothy following her October 2019 evaluation:

So his diagnoses were failure to thrive, inappropriate weight gain that's unexplained by his prematurity, wonderful interval weight gain that had happened since he was placed in custody, and that would, again, support neglect as the etiology of the failure to thrive. That he had discoordinated suck and swallow with concerns for development and movement. And a flattened back of his head, which, again, is seen commonly in neglect. Can be seen in other settings as well.

Dr. Palmer also diagnosed Timothy with "medical neglect." She clarified:

There were multiple missed appointments for well-child care, which it could have been brought to the family's attention that he was growing poorly. I think there's evidence as well of general situational neglect, as evidenced by the neurodevelopmental failure there. And that may support the reason for failing to meet the medical appointments as well.

Dr. Palmer further opined that Timothy had developmental concerns. She noted that his intake examinations for speech therapy and physical therapy were performed on December 5, 2020. She summarized: "For speech therapy his auditory responses were rated as zero-to-four months. His expressive was zero-to-two months. And then on physical therapy, for gross motor he was estimated to be about five months." She explained that although those measures did not account for Timothy's prematurity, he was nine months of age by that time, so even corrected for prematurity, he had developmental delays, which she related to Timothy's earlier malnutrition. Dr. Palmer noted that "the biggest part of malnutrition anemia, anything related to nutrition, is effect to the brain and growth and development."

Dr. Palmer reported that when Timothy was subsequently evaluated at sixteen months of age, after he had been in foster care for nine months, he weighed 9.7 kilograms, "which put him about the 10th to 25th percentile." She noted that this measure was without the correction factor because "[t]hose babies born 34 to 36 weeks will generally correct within the first year of life."

When questioned regarding whether, based on her evaluation of Timothy, she thought that he had suffered from abuse or neglect likely to cause serious bodily injury or death, Dr. Palmer answered in the affirmative. She explained:

> [G]oing to the neurodevelopmental problems with the brain, not being properly nourished. Taken to the extreme that can lead to death. But certainly I would consider brain injury to be a significant injury that would satisfy that statement.

Dr. Palmer added that the Parents may have missed the developmental lapses in Timothy because they did not keep up with medical appointments and did not associate with children near the same age.

On cross-examination by Father's counsel, Dr. Palmer acknowledged that the Harton Tennova emergency room provider did not make a finding one way or the other regarding abuse or neglect. However, Dr. Palmer emphasized that Harton Tennova staff "did recognize that the child was poorly growing, in terms of percentile and weights that he should be." She added that "[t]hey gave nutritional recommendations, with the expectation that he would be seen in follow-up with primary care provider, assisted in that evaluation ongoing by DCS." Reviewing the Saint Thomas Rutherford record, Dr. Palmer stated: "[T]here was not any difference, I felt, in terms of their final conclusion; that they agreed that the child had failure to thrive and that he would need follow-up with his primary care provider." When questioned regarding whether she would have had an emergent concern based on what she could glean from the two emergency room records, Dr. Palmer answered in the affirmative. She explained:

> And I think that's the difference between a pediatric ER versus a general ER. And then in addition, my interest as a child abuse pediatrician. So what I would have done was chart and saw that this is the growth previously and this is the growth now. So he's way below the growth curve. Whereas, they don't have access to the growth curve, for the most part, in those offices. Their systems don't automatically plot them on grown curves as mine does. So they don't have that visual to get a greater sense of urgency.

- 37 -

Regarding Timothy's hospitalization at ETCH, Dr. Palmer relayed that after her October 2019 evaluation, Timothy had developed a respiratory illness requiring hospitalization and that the ETCH providers felt that improper nutrition had played a role in the severity of the illness. When questioned by the GAL concerning the dangers involved in diluting formula with water, or diluting two-percent milk as the Parents had been doing prior to Timothy's removal from their care, Dr. Palmer stated that the dangers were "multiple." She added:

> The biggest [danger] is poor weight gain, but secondarily, you can also develop electrolyte abnormalities. So it deletes out, most importantly, the sodium in your blood, and you can develop hyponatremia. And then there's multiple complications that can happen from that electrolyte abnormality.

During the second deposition, Dr. Palmer reported that Timothy's last well-child check-up at that point had been conducted when he was twenty-four months of age on March 23, 2021, and it showed his weight to be between the 10th and 25th percentile. She testified that "[f]rom time of removal from parental custody he started gaining weight and – quite well . . . since then the data points for his weight and height show that he has had full recovery of both of height and weight in custody." Dr. Palmer again opined that under the Parents' care, Timothy had suffered from abuse and neglect likely to cause serious bodily injury or death. When questioned regarding what would have happened if Timothy had not come into protective custody, Dr. Palmer concluded: "I do believe that the nutritional deficiency that he had that led to failure to thrive could reasonably be expected to cause him to have severe developmental disability and – and be unable to function normally in society as a result of that."

On appeal, the Parents argue that the trial court erred by relying on insufficient evidence and "speculative" testimony. In challenging Dr. Palmer's deposition testimony, the Parents assert that Dr. Palmer, and in turn the trial court, (1) failed to take Timothy's premature birth into account, (2) ignored "contradictory" medical records from the two emergency rooms involved, and (3) "misattributed" Timothy's respiratory illness to the Parents' care because he was in foster care when he contracted the illness. Having carefully reviewed Dr. Palmer's deposition testimonies, we disagree.

First, Dr. Palmer addressed the effect of Timothy's prematurity throughout her testimony, explaining the corrected measure for Timothy's weight in detail and taking great care to note any time that a growth or developmental measure had not accounted for his prematurity and needed adjustment. Second, Dr. Palmer reviewed the emergency room records from both Harton Tennova and Saint Thomas Rutherford and discussed them in her testimony. The Parents insist that the emergency room records show that those providers cleared them of any abuse or neglect, but this is not the case. When cross-examined by

Father's counsel regarding the emergency room records, Dr. Palmer stated:

> [W]hile there's not a diagnosis of failure to thrive, it is noted that they had a concern for growth. Failure to thrive is a diagnosis that relies on seeing growth over time in terms of thriving and requires some evaluation of other points in time and understanding other past medical history and other features of the child itself.
>
> I can tell you that the ER did note a concern for growth and made some efforts to do education and ensure follow-up for those concerns.

Neither emergency room record included a "clearance" of the Parents for abuse or neglect.[11] Finally, regarding Timothy's hospitalization for a respiratory illness, the trial court acknowledged that Timothy had been hospitalized for the illness "within a week or so of being in foster care" but credited Dr. Palmer's testimony that the inability of Timothy's body to "fight off" the illness" was "a direct result of the malnutrition" he experienced while in the care of the Parents.

The trial court determined that the Parents had "committed severe child abuse against Timothy" by "depriv[ing] him of proper nutrition for 135 days," resulting in "serious bodily injury and developmental delays." The court further found that "this deprivation of nutrition could have resulted in the child's death" if it had "not been for the intervention" of DCS. In the conclusion of the order, the court found that the Parents had committed severe child abuse against Timothy "as defined by Tenn. Code Ann. § 37-1-102," which includes a "knowing" mental state on the part of the Parents. *See* Tenn. Code Ann. § 37-1-102(b)(27)(A) (defining severe child abuse in pertinent part as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death . . . ."). However, the trial court did not expressly find in its order that the Parents' actions or failure to act had been "knowing."

DCS maintains that the evidence supported a finding that the Parents' conduct was knowing because they (1) knew or should have known that Timothy's lack of weight gain was a serious concern, (2) missed several medical appointments that could have alerted them to the concern, and (3) did not put enough formula in Timothy's bottle and persisted in claiming that watered-down two-percent milk would suffice to feed him even after being advised otherwise. Upon our independent review, we agree with DCS on these points. *See*

[11] As noted in the factual section of this Opinion, the Parents have repeatedly filed motions in this Court attempting to supplement the record with, *inter alia*, the Harton Tennova and Saint Thomas Rutherford emergency room medical records. However, the medical records from these emergency rooms are already in the appellate record as attachments to pleadings filed by the Parents during the termination proceedings (namely their response to the termination petition and their motion for relief).

*In re Markus E.*, 671 S.W.3d at 444 (holding that for the statutory definition of severe child abuse, "a person's conduct is considered 'knowing,' and a person is deemed to 'knowingly' act or fail to act, when he actually knows of relevant facts, circumstances or information, or when he is either in deliberate ignorance of or in reckless disregard of such facts, circumstances, or information presented to him"). Moreover, the trial court adopted Dr. Palmer's depositions in their entirety, and Dr. Palmer diagnosed Timothy with "medical neglect," meaning that the Parents had missed multiple well-child care appointments when "it could have been brought to the family's attention that he was growing poorly." We therefore determine that the trial court's omission of the word "knowingly" was harmless error and affirm the trial court's severe abuse determination under § 37-1-102(b)(27)(A).

Furthermore, § 37-1-102(b)(27)(B) defines severe child abuse in relevant part as "abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce . . . severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment . . . ." This Court has previously held that subsection (B) does not require a finding that the parent knowingly neglected the child "in order to support a finding of severe child abuse." *In re Keara J.*, 376 S.W.3d 86, 101 (Tenn. Ct. App. 2012). *In re Keara J.* involved termination of parental rights based in part on a finding of severe abuse of a child who had been found to suffer from failure to thrive and developmental delays due to malnutrition and neglect, including medical neglect involving several missed appointments. *Id.* at 101-02 ("[S]uch expert testimony clearly and convincingly establishes that Keara was subjected by Mother and Father, her only caregivers, to neglect that was reasonably calculated and did lead to severe developmental delays and an inability to function adequately in her environment."). Dr. Palmer testified that "the nutritional deficiency that [Timothy] had that led to failure to thrive could reasonably be expected to cause him to have severe developmental disability and – and be unable to function normally in society as a result of that."

Upon our through review of Dr. Palmer's depositions and the record as a whole, we determine the trial court's adoption of Dr. Palmer's depositions as expert testimony to be supported by the evidence. We therefore conclude that the trial court's finding, by clear and convincing evidence, of the Parents' severe child abuse of Timothy was warranted under subsection (B) as well as subsection (A) of § 37-1-102(b)(27). The trial court did not err in terminating Father's and Mother's parental rights pursuant to this statutory ground.

### C. Failure to Manifest an Ability and Willingness to Assume Custody of or Financial Responsibility for the Children

The trial court also found clear and convincing evidence to support termination of Father's and Mother's parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(14), which provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Our Supreme Court has explained the following regarding this ground for termination of parental rights:

> Two prongs must be proven by clear and convincing evidence to terminate parental rights under this statute: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

As to the first prong, our Supreme Court has held:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied.

*Id.* at 677. Concerning the "substantial harm" requirement of the second prong, this Court has observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a

real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at \*8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted in *Maya R.*)).

In its final judgment, the trial court set forth the following specific findings of fact regarding this statutory ground as to both parents:

> The Court finds by clear and convincing evidence that [Mother] and [Father] have failed to manifest an ability and willingness to assume legal and physical custody and financial responsibility for the children and that placing the children in the legal and physical custody of [Mother] and [Father] would pose a risk of substantial harm to the physical or psychological welfare of the children.

> When Timothy entered foster care, he was seven months old. He was severely underweight. Timothy initially struggled with respiratory illnesses and hospitalizations when he first entered foster care. He had problems with his speech as well. Today, Timothy is four years old. He is thriving and has had no hospital stays within the past couple of years. He talks now and knows his ABCs and is in a loving foster home.

> Ms. Brown testified that [Father] was argumentative and wanted to fight all of the time instead of work with [DCS]. [Father] was very aggressive towards FSW Brown and others who were trying to help him. [Father's] in-person visitation stopped in 2020. He was unwilling to work with [DCS]. In October of 2020, [Father] cussed Ms. Brown out after court. Ms. Brown testified that [Father] is paranoid, that he filed multiple complaints on DCS workers, DCS attorneys, and attorneys who had been appointed to represent him in the past. [Father] has had seven different attorneys and has not been satisfied with any of them. On multiple occasions [Father] and [Mother] separated. [Father] violated restraining orders and was very aggressive towards Ms. Brown, [the GAL], and others who were trying to help him.

> [Father] would not and did not complete anything on the permanency plan. Ms. Brown testified that she tried to engage with [Father] about drug

treatment, but he denied that he needed assistance and said that he did not have a drug problem. Ms. Brown tried to get treatment for [Father] at Bradford Health Services for two months and [Father] refused. Then Ms. Brown recommended that [Father] go to Health Connect for an alcohol and drug assessment. [Father] went to his assessment, but he was not honest during his assessment. [Father] failed multiple drug screens. He took one hair follicle drug screen and tested positive for cocaine, see Exhibit 17. [Father] told Ms. Brown that he used cocaine every couple of days. [Father] did not complete any of the recommendations from his alcohol and drug assessment.

[Father] had a psychological assessment, but he was not honest on his psychological assessment. And he did not complete any of the recommendations. He denied any domestic violence in the home, which is directly contradicted by the incident with the pickle jar in the home and [Mother's] admission that she had to cover up bruises. [Father] presented certificates of completion for domestic violence classes. [Father] submitted other certificates from unrecognizable sources that Ms. Brown could not verify. [Father] needed to complete parenting classes and reported that he had completed them online; however, [Mother] reported to Ms. Brown that [Mother] completed all of the online assignments for [Father].

[Father] reported early in the case that he worked at Kroger but would not provide any check stubs. Ms. Brown was never able to verify any income to show that he could take care of the children. [Father] has not provided any type of income verification since June of 2020. [Father] insisted that Ms. Brown no longer contact him and that all contact must go through the United States Postal Service but would not provide an accurate and valid address. [Father] said that he would file charges for harassment if Ms. Brown contacted him again.

[Father] and [Mother] were not forthcoming with accurate and valid home addresses. Ms. Brown was able to complete a home visit at a home on Kay Parker Road where there was HVAC wrapping stapled up through the wall and there were holes in the ceiling in Krystopher's bedroom. Ms. Brown testified that the last time she saw that home there was nothing but rafters and a shell of a home left. [Mother] and [Father] moved out of that house and had other addresses, but [DCS] was not able to verify any address to complete a home visit. [Mother] and [Father] have not provided an address that could be verified so [DCS] has not been able to do a home visit. There

was an address given of a home in Crossville, but the address has not been verified and neither parent has allowed Ms. Brown to do a home visit.

[Father] would sign only partial releases of information. When [Father] would sign a full release so that Ms. Brown could communicate with service providers, [Father] would not do the follow up recommendations of the service providers. [Father] would not be open and honest in his assessments. He denied drug use and mental health concerns. [Father] was oppositional to [DCS]. Ms. Brown testified that [Father] has not engaged in permanency plans or child and family team meetings in several years. [Father] has had the opportunity to be present in court to express his concerns to the court and he did not show up to this hearing.

The children would be subject to a substantial risk of harm if they were returned to the physical and legal custody of [Father] in that Timothy [C.] does not know [Father]. [Father] would not provide the basic necessity of food to Timothy when [Father] had Timothy in his home. Timothy has not seen [Father] since Timothy was a little over a year old and Timothy does not know who [Father] is. Placing a child with a virtual stranger constitutes a substantial risk of harm. [Father's] untreated drug use and his continued opposition to anything that has been recommended to remedy [Father's] situation poses a substantial risk of harm to Krystopher. If Krystopher were to be returned to [Father's] custody, Krystopher would once again be subjected to [Father's] drug and alcohol abuse, domestic violence, and overall neglect.

Krystopher is in need of counseling that [Father] has continued to disrupt. Ms. Brown testified that one of the recommendations for Krystopher in his residential facility was family therapy. Family therapy was attempted with Krystopher and [Mother]. That therapy had to be stopped because [Father] continually interrupted the therapy sessions.

[Mother] has failed to manifest an ability and willingness to assume legal and physical custody or financial responsibility for the children. [Mother] was supposed to have a psychological assessment, a parenting assessment, domestic violence counseling, obtain and maintain safe and stable housing, maintain a legal means of income, and visit her children. [Mother] completed a psychological evaluation and a parenting assessment and there were serious concerns with her anger and her parenting ability. The psychological evaluation concluded that [Mother] could parent, but she must have assistance. She was also recommended to have trauma therapy.

During the time that [Mother] was no longer living with [Father], Ms. Brown testified that there were visits in [Mother's] home. During one visit a man came over the balcony into the living room and introduced himself to the children, unbeknownst to Ms. Brown. Ms. Brown immediately pulled the children back away from the man and explained to [Mother] that there cannot be random people coming to the visits. This same random man came out of the bedroom at other visits because [Mother] wanted him to participate.

Another time in October of 2021, Ms. Brown took the children to the home for a four-hour visit. [Mother] was in her nightgown. Ms. Brown brought food to the visit so that the children could have breakfast because [Mother] rarely had food in the home. [Mother] had another man in the home. The children had to be taken out of the home and the visit was completed at a playground across the street because the man stayed in the home for the duration of the visit.

Shortly after the October 2021 visit, [Mother] allowed [Father] to live with her. After [Father] moved in with [Mother,] Ms. Brown has not been able to complete a home visit. [Mother] has not shown that she can live on her own without random men or [Father]. She has not shown that she is able to feed, clothe, and house the children. [Mother] lives with [Father] who does not allow [Mother] to speak for herself and who prevented [Mother] from fully working her plan.

[Mother] had a psychological evaluation and the assessment showed that [Mother] has anger issues and cannot parent without assistance. [Mother] was recommended to complete EMDR [eye movement desensitization and reprocessing therapy] and have cognitive behavioral therapy. [Mother] did not do those treatments.

[Mother] has not shown any proof of a legal means of income so that she would be able to support the children.

If the children were placed back in the legal and physical custody of [Mother], they would be subject to a substantial risk of harm. This is largely due to her living with [Father], whose issues were discussed above. When [Mother] is not living with [Father], she allows other random men to be in her home. On one occasion a man named [B.H.] came out of the bedroom and introduced himself to the children as "Stitch." Another time a man

named [R.Y.] was at the home during a visit with Timothy and the visit had to be relocated to a nearby park because [R.Y.] would not leave.

The children would also be subject to a substantial risk of harm if placed back into the legal and physical custody of [Mother] because [Mother] struggles to interact with Timothy. She has to be reminded to bring food and activities for the children and rarely has food in[] the house. This shows again that [Mother] is not able to feed her children. Ms. Brown had to bring food and activities for the visits between [Mother] and Timothy. [Mother] also relied upon Krystopher to entertain Timothy during the visits with both children. [Mother] has not had any in-person visitation with Krystopher since November of 2022. Ms. Brown offered gas cards, hotel vouchers, and transportation to [Mother] so that she could visit Krystopher, but [Mother] did not want to visit Krystopher or have any type of meaningful visits with him. [Mother] went to Krystopher's juvenile court proceedings for his delinquent issues, but she never interacted with Krystopher, offered to have lunch with him, or even asked how he was doing. [Mother] had video visits with Krystopher and would only talk about her cats and Alabama football. Sadly, Krystopher wants to be reunited with his parents, but the absence of [Mother] and [Father] at today's hearing shows that they do not want to be reunited with their children. The Court is impressed with Krystopher. Krystopher is very well behaved, he is respectful to adults, and desires to make consistent improvements and this Court wishes only the best for Krystopher. Finally, [Mother] cannot parent without assistance and [Father] does not and will not provide the assistance that [Mother] needs to successfully parent. Therefore, the parental rights of [Mother] and [Father] should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(14).

(Footnote omitted.) Upon thorough review of the record, we determine that the evidence preponderates in favor of the trial court's findings.

Regarding the first prong, the Parents contend that the trial court erred in finding that the Parents had not demonstrated willingness to assume custody, pointing to Father's participation in domestic violence counseling and submission to drug screens early in the process and Mother's participation in parenting classes and therapy when she was separated from Father. They assert that Mother's progress was inhibited by "systemic barriers" such as lack of transportation and "inconsistent therapeutic referrals from DCS." The Parents posit that Father's "reluctance to comply with invasive requirements reflects frustration with DCS's perceived bias rather than unwillingness." Concerning the Parents' ability to assume custody, they argue that the trial court ignored evidence of the Parents' having established a home together and of Father's ability to earn income as evinced by

Ms. Brown's testimony that Father presented two to four check stubs from an employment agency in 2020.

We find the Parents' arguments unpersuasive. The statute requires that the Parents "manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." *See* Tenn. Code Ann. § 36-1-113(g)(14). Even those actions noted by the Parents above occurred only early in the time period that the Children had been in protective custody. And those actions were simply not sufficient to manifest that the Parents were willing to amend their circumstances to safely assume legal and physical custody of the Children.

The Parents claim that the trial court "ignored" Father's two to four check stubs from an employment agency presented in 2020. Ms. Brown testified that Father had stated at the time that he was working at Kroger through the employment agency. However, she further testified that Father had presented no proof of employment at Kroger. Those two to four check stubs were the only proof offered by Father of any employment during the years the Children had been in protective custody. Ms. Brown testified that in June of 2020, Father "told me that he did not want any more contact with me, that if I reach out to him again, he would file charges for harassment." Father repeatedly rejected assistance and opportunities to demonstrate that he was able and willing to assume legal and physical custody of or financial responsibility for the Children. Despite the Parents' assertion that the trial court failed to consider the Parents' efforts "to secure housing" in Crossville "from 2022 to current," there is no evidence in the record that the Parents ever provided DCS with documentation of a stable home situation, other than an address, or that they had allowed DCS to investigate the stability or safety of a physical home after 2021.

As the trial court found, Mother did make progress when she was separated from Father, but trial testimony demonstrated that Mother stopped participating in therapy and attempting to meet other requirements when she allowed Father to reenter her home in 2021. Ms. Brown testified that when Mother was not living with Father, she "opened up" to Ms. Brown, signed releases, communicated, and allowed Ms. Brown to help her. According to Ms. Brown, she drove Mother to several appointments and to pay bills, and Ms. Brown transported the Children at times to visits with Mother. Ms. Brown relayed that DCS's concerns with Mother at that time were strange men in the home; cleanliness, particularly not keeping up with hygiene for two cats; and food supplies. She stated that DCS gave Mother referrals for community resources for food and that Ms. Brown offered to assist Mother in preparing food for Timothy's visits. Ms. Brown also testified that during that time, Mother talked openly about Father's "control" and that he had "put his hands on" Mother in violence. Ultimately, the evidence demonstrated that Mother's progress was incomplete and that it came to a stop when she reunited with Father.

Regarding the second prong of this statutory ground, the Parents contend that in finding a risk of substantial harm to the Children if they were returned to the Parents' custody, the trial court "relied on past hearsay allegations of malnutrition and domestic violence without considering current circumstances or improvements made by [the Parents]." On the contrary, we determine that the trial court carefully considered the evidence presented at trial and the current situation of the Parents and each child. Testimony presented during trial demonstrated that although Mother attended visits with Timothy, she continued to struggle with providing even snacks for him during visits and continued to struggle with other parenting skills.

Additionally, the Parents failed to establish that they had remedied concerns of domestic violence, employment and housing instability, and Father's illicit substance abuse. *See In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) (noting that "parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence could lead to a conclusion of a risk of substantial harm"). Particularly concerning Timothy, the trial court considered proof regarding the bonded relationship between Foster Mother and the Child, as well as Foster Mother's other children. This Court has previously recognized that removing children from families with whom they have bonded over time and from stable home situations can "pose a risk of substantial harm to the physical or psychological welfare of the [child]." *See In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *12 (Tenn. Ct. App. Apr. 11, 2016) (quoting *State v. C.H.H.*, No. E2001-021-7-COA-R3-CV, 2002, WL 1021667, at *8-9 (Tenn. Ct. App. May 21, 2002)).

We determine that the evidence preponderates in favor of the trial court's findings regarding (1) the Parents' failure to manifest an ability or willingness to assume legal or physical custody of or financial responsibility for the Children and (2) the risk of substantial harm to the Children if they were returned to either parent's custody. Accordingly, we affirm the trial court's determination by clear and convincing evidence regarding this statutory ground for termination of Father's and Mother's parental rights.

## VII. Best Interest of the Children

When, as here, a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i)(1) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's

best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) lists the following factors for consideration:

(A)  The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)  The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)  Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)  Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)  Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)  Whether the child is fearful of living in the parent's home;

(G)  Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)  Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)  Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or

foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides:  "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."  Tenn. Code Ann. § 36-1-113(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis.  In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)).  Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence."  In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861).  "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]."  Id.  When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective."  In re Audrey S., 182 S.W.3d at 878.  Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors.  Id.  "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ."  Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors.  In re Audrey S., 182 S.W.3d at 878.  And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination.  White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).  Rather, the facts and circumstances of each unique case dictate how weighty and relevant each

statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its final judgment, the trial court made detailed findings regarding the best interest factors and concluded that all but two of the factors weighed in favor of terminating Father's and Mother's parental rights to the Children. Upon careful review of the evidence presented, we conclude that clear and convincing evidence established that termination of Father's and Mother's parental rights was in the Children's best interest. Given the similarity of the trial court's analysis as to Father and Mother, we will address application of the best interest factors to both parents simultaneously, noting distinctions when needed. The Parents' argument in opposition to the trial court's analysis of the Children's best interest is confined to their appellate reply brief and relies on the procedural and evidentiary challenges addressed in other sections of this Opinion.

Factors (A), (C), and (J) are related by reason of their emphasis on the Children's stability and safety. The trial court determined that factor (A) weighed in favor of termination because "termination of parental rights will have a positive impact on the children's critical need for stability and continuity of placement through the children's minority." The court noted Timothy's bond with Foster Mother, who "is a school nurse who has cared for all of Timothy's needs since he entered her home," and Krystopher's success in "working through treatment" with mentors and services available in his facility placement. The court found that upon termination of parental rights, the Children "will no longer be subjected to domestic violence, drug abuse, nutritional neglect, and the general instability that was life with [Father] and [Mother]." Concerning factor (C) (whether the Parents have demonstrated continuity and stability in meeting the Children's needs), the court found that "neither [Mother] nor [Father] have demonstrated any ability to provide safe and stable housing for their children." In determining that factor (C) weighed in favor

of termination, the court further found that the Parents could not meet the "safety needs" of the Children because of domestic violence in the home and that the Parents had provided no proof of their ability to meet the Children's material needs.

The trial court also determined that factor (J) (whether the Parents had demonstrated a lasting adjustment) weighed in favor of termination. Specifically, the court found that Father's cocaine and alcohol use were unacceptable. The court noted Ms. Brown's testimony that Father "admitted that he was an alcoholic and he has not sought treatment for that despite Ms. Brown offering many opportunities to [Father] for an alcohol and drug program and aftercare." As to Mother, the court stated that she "is not able to parent on her own and when she is with [Father], she regresses instead of making improvement." The court noted that Mother had "tested positive for cocaine and, whether that was from being in the same home as [Father], it is a cause of great concern." Regarding domestic violence, the court found that Father had "reported being domestically assaulted by [Mother] several months after she hit him over the head with a pickle jar" but that Father had then "denied domestic violence as either a victim or perpetrator in his psychological evaluation." We conclude that the evidence supports the trial court's findings regarding factors (A), (C), and (J).

The trial court also determined that factor (B) (the effect a change of caretakers and physical environment would have on the Children) weighed in favor of termination. The court found that Father had "had very little contact with the children since they entered foster care" and that although Mother had visited Timothy, she "would not bring a meal for her child and did not recognize, or did not care, that her child, who had been awake for two to three hours before the visits began, would be hungry." The court further found that the Parents were "unable to provide for the medical, dental, and psychological needs" of the Children, noting that Father particularly had "downplayed and denied any concerns that Timothy was malnourished or underfed" and had "tried to disrupt Krystopher's therapy and mental health treatment." The court stated that Father had "not worked his plan or been involved in a meaningful way" and that Mother could not "parent without assistance," Specifically as to Timothy, the court concluded that "[i]f Timothy were to go back to [Father] or [Mother], it would be traumatic to him," and that "Timothy would not recognize [Father]." The evidence preponderates in favor of the trial court's findings as to factor (B).

Factors (D), (E), (H), and (I) are related due to their emphasis on parental attachments and relationships, and the trial court determined that all four factors weighed in favor of termination. With respect to factor (D) (whether the parent and child have a secure and healthy attachment), the trial court concluded that there was "no reasonable expectation that a healthy parental attachment can be created between either parent and the children." Concerning Timothy, the court found that he was "well-bonded with his foster mother and not with [Mother]." The court credited testimony that Timothy knew "his

foster mother as his mother" and that Mother "relied upon Krystopher to entertain Timothy" during visits. Regarding Father's relationship with Timothy, the court stated that Father had "not been involved in Timothy's life and Timothy would not be able to recognize [Father] and has not seen [Father] in three years." Although the court acknowledged that "Krystopher loves his parents and wants to be with them," the court determined that "the parental attachment is not healthy for Krystopher."

As to factor (E) and the Parents' visitation with the Children, the trial court concluded that Father had "not seen the children since 2020" and that Mother's visits with the Children "were not meaningful." The court credited testimony that Mother failed to provide for "Timothy's physical need for food" and "his need for mental stimulation in activities." The court found that Mother struggled with providing safety during visits and had "random men present at the visits" when she was separated from Father. As the court noted, testimony also indicated that Mother refused to visit in person with Krystopher at his facility, and she struggled to have meaningful conversations with him via telecommunications.

Concerning factors (H) (whether the child has created a healthy parental attachment with another person) and (I) (whether the child has emotionally significant relationships with other persons), the trial court found that Timothy was bonded to Foster Mother and "had a great relationship with the other children in the foster home." The court summarized: "There is a lot of support and care for Timothy in that home." While noting that Krystopher's residential facility placement was "not a permanent solution," the court found that Krystopher "has mentors and support staff there who care about him" and "are willing to help him." The evidence preponderates in favor of the court's findings as to factors (D), (E), (H), and (I), and we agree with the trial court's decision to weigh these factors in favor of termination.

Factors (F) and (G) relate to the Children's previous experiences in the Parents' home and any trauma resulting from those experiences. Regarding factor (F), the trial court concluded that no evidence indicated that either child was fearful of living in the Parents' home. The court stated that when Timothy "was removed from their home, he was likely too young to be fearful." As for Krystopher, the court noted that he "probably would like to return" to the Parents while also finding that returning would not be in Krystopher's best interest. Likewise, concerning factor (G) (whether the parent or parent's home triggers or exacerbates trauma), the court found no "substantial proof" that Krystopher had "experienced trauma" in the Parents' home and again found that Timothy "was removed so early that he may not have experienced any trauma." The court stated its concern that "living in a home where there is domestic violence and drug use is not a good environment and trauma could be sustained."

The trial court did not expressly state that it weighed factors (F) and (G) against termination. However, this Court has previously determined that in a situation where the only evidence regarding factors (F) and (G) supports a lack of fear and trauma, the factors weigh against termination of parental rights. *See In re Layton S.*, No. W2024-00973-COA-R3-PT, 2025 WL 1088253, at *18 (Tenn. Ct. App. Apr. 11, 2025) (concluding that factors (F) and (G) weighed against termination when the trial court had made no findings as to the factors, the mother had "offered testimony indicating the Child's lack of fear and trauma," and the petitioners had "failed to introduce countervailing evidence as to these factors"); *see generally In re Colten B.*, No. E2024-00653-COA-R3-PT, 2025 WL 252663, at *9-10 (Tenn. Ct. App. Jan. 21, 2025) (examining the applicability of factors (F) and (G) when the child has never lived in the parent's home or when no evidence concerning the factors has been presented at trial). We therefore conclude that in this case, factors (F) and (G) weighed against termination of Father's and Mother's parental rights.

Factors (K) and (L) both concern services and assistance offered to the Parents. With respect to factor (K) (whether the parent has taken advantage of available programs and services), the trial court determined that the Parents "did not take advantage" of the "many different resources" offered to them by DCS and Ms. Brown. We note that the evidence indicated that Mother had taken advantage of services for a few months when she was separated from Father but that she had stopped doing so by late 2021. Specifically as to Father, the trial court found that "he denied having a drug problem and did not remedy the problem" and that he had "not submitted to a drug screen in several years," leading the trial court "to question whether criminal activity [was] still happening in the home." The court thereby weighed factor (K) in favor of termination.

The trial court also weighed factor (L) in favor of termination, finding that DCS had made reasonable efforts to assist the Parents. The court relied upon and incorporated into its order Ms. Brown's affidavit of reasonable efforts, which was, as the court noted, "over fifty pages long." As noted previously in this Opinion, on appeal, the Parents have challenged the admission into evidence of the affidavit of reasonable efforts, but we have deemed that they waived this issue by failing to raise it in the trial court or object at the time of admission. Additionally, as DCS points out, Ms. Brown testified regarding the items listed in the affidavit, and the trial court found her testimony to be "very credible." The court stated:

> Ms. Brown did everything that she could to try to reunite [Father] and [Mother] with the children. [Father] and [Mother] would not cooperate. In fact, [Father] admitted in October of 2020 that he should have accepted Ms. Brown's help, but he did not. After that, he refused any contact with Ms. Brown and told her that the only way she could communicate with him was through the United States Postal Service.

We emphasize that the trial court's determinations regarding witness credibility are entitled to great weight on appeal. *See Jones*, 92 S.W.3d at 838. The evidence preponderates in favor of the trial court's findings that factors (K) and (L) weighed in favor of termination.

Factors (M), (P), (Q), and (R) all relate to the Parents' actions to meet the Children's needs. We agree with the trial court's determination that all four of these factors weighed in favor of termination. With respect to factor (M) (whether the Parents had demonstrated a sense of urgency in addressing the conditions that made an award of custody to them unsafe), the trial court found that the Parents had not demonstrated a sense of urgency because at the time of trial, "this case [had] been ongoing for four years and there [had] been little to no progress in addressing the issues that make an award of custody to [Father] and [Mother] unsafe and not in the children's best interest." These facts also apply to factor (P) (whether the Parents demonstrated an understanding of the basic needs required for the Children to thrive) and factor (Q) (whether either parent demonstrated the ability and commitment to creating a home that would meet the Children's needs). Furthermore, the evidence preponderates in favor of the following findings made by the court regarding the Children's specific needs and the Parents' home:

> Timothy's most basic need, the need for food, was neglected. Timothy was failing to thrive and at risk of death in the care of [Father] and [Mother]. [Father] and [Mother] did not feed Krystopher either. Krystopher had to prepare his own TV dinners. Krystopher had to protect Timothy while [Mother] and [Father] fought. Not only do [Mother] and [Father] not have a basic understanding of their children's needs, but they also cannot even care for themselves. [Father] admitted that he copes with regular cocaine use and drinking a 12-pack of beer at night. [Mother] is unable to provide a breakfast meal at her visitation with Timothy and instead brings a Little Debbie snack even after being counseled by homemaker services and Ms. Brown to have a breakfast for Timothy. [Mother] did not bring any activities for Timothy and, when she visited both children together, [Mother] relied upon Krystopher to entertain Timothy.

> * * *

> [Father] and [Mother] could not provide a home that meets the children's basic needs. At the one home visit that Ms. Brown was permitted to conduct, the home had HVAC wrapping stapled on the wall and there was a hole in the ceiling in Krystopher's bedroom. These things were never remedied. [Mother] and [Father] had a volatile relationship and on multiple occasions they separated. [Mother] would bring strange men into her home when she

was not living with [Father]. Neither parent provided an address to verify that the home would be suitable for the children. Beyond the physical home, the parents are not in a position to care for the children based upon the drug use and domestic violence that has gone on in the home.

Additionally, the trial court found as to factor (R) (concerning the physical environment of a parent's home) that the Parents had "not provided an address for [DCS] to verify [their home's] suitability." The court further found that early in the case, "[w]hen the parents did allow a home visit, the home was not suitable."

The trial court also weighed factor (O) (whether the Parents had ever provided safe and stable care for a child) in favor of terminating Father's and Mother's parental rights, finding that "[t]here is no proof that [Father] or [Mother] have ever provided safe or stable care for these children." The court noted "the domestic violence in the home," Father's drug use, Mother's "acquiescence to the drug use by staying with [Father]," and Mother's "moving multiple men in and out of the home when she was not living with [Father]." The court also found that the Parents were "not stable" and that neither had "shown proof of a legal means of income" or "safe housing." The evidence preponderates in favor of the court's findings. With respect to factor (S) regarding child support, the court reiterated its previous findings that Father had paid no child support while the Children were in protective custody and that Mother had provided only small items. The court stated: "There was no provision of winter clothing, school supplies, or anything that the Court could point to that would show that [Mother] or [Father] wanted to take an active role in supporting the children." The evidence also preponderates in favor of these findings.

Concerning factor (T) (each parent's mental or emotional fitness), the trial court determined that Father's drug and alcohol use made "him less than mentally or emotionally fit to parent the children" and that Mother "is not emotionally or mentally able to parent the children." The court reiterated its findings regarding the domestic violence in the Parents' home, Mother's "anger problems" and Mother's inability to fully engage with either Timothy or Krystopher during therapeutic visits. As the court noted, testimony indicated that during visits with the Children, Mother tended to focus on her own concerns and "not ask about [the Children's] health or follow up with doctor's appointments." The trial court's findings concerning the Parents' respective mental and emotional fitness to parent the Children were supported by the evidence.

Moreover, the trial court determined that factor (N) weighed in favor of terminating Father's and Mother's parental rights because both parents had been found to have committed severe child abuse against Timothy. The court emphasized its previous findings that the Parents had "failed to proper[ly] feed [Timothy] and as a result he was severely

malnourished with the risk of substantial injury and possible death." The court's findings concerning factor (N) were supported by the evidence.

In sum, the trial court's findings that all but two of the best interest factors weighed in favor of termination were supported by clear and convincing evidence. We therefore affirm the trial court's determination by clear and convincing evidence that termination of Father's and Mother's parental rights to the Children was in the Children's best interest.

## IX. The Parents' Remaining Issues

The Parents assert that the trial court's judgment should be "invalidate[d]" because of alleged fraud committed upon the trial court. The Parents allege that Ms. Brown's affidavit of reasonable efforts constituted "fraudulent evidence" and that the trial court clerk committed misconduct by employing a retired clerk's stamp to mark the filing of documents and by failing to file all of the Parents' *pro se* pleadings. The Parents alleged fraud throughout many of their pleadings during the termination proceedings. However, as established previously, the Parents did not appear at trial to present any evidence or argue in support of their allegations. Accordingly, we find the Parents' argument regarding fraud to have been waived. *See Goodrich*, 2022 WL 3592612, at *2 ("[A] party 'who failed to take whatever action [that] was reasonably available to prevent . . . an error' waives the issue." (quoting Tenn. R. App. P. 36(a))). Moreover, upon our thorough review of the record, we discern no evidence of fraud committed upon the trial court by DCS or the clerk's office.

Finally, the Parents urge reversal of the trial court's judgment due to "cumulative errors" committed by the trial court. Having found no reversible error in the trial court's judgment, we determine this argument to be unavailing.

## X. Conclusion

For the foregoing reasons, we reverse the trial court's finding that Mother abandoned the Children by failing to support them. We affirm the trial court's judgment in all other respects, including the termination of Father's and Mother's parental rights. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's and Mother's parental rights to the Children and collection of costs below. Costs on appeal are assessed one-half to the appellant, Roy C., and one-half to the appellant, Krystle J.

s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II, JUDGE